UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
                                  :

MLP I and QCR 77 LLC,
                                  :

               Plaintiffs,
                                  :

                v.
                                  :        No. 08 CV 511 (CLB)

MYCA, LLC and 2220 EQUITIES             **FILED BY ECF**
MANAGEMENT LIMITED PARTNERSHIP,
                                  :

               Defendants.
                                  :

                                  :
--------------------------------------------------------- x

<u>AFFIDAVIT OF MICHAEL EDWARD BREEDE</u>

STATE OF CONNECTICUT  )
                       )   ss.: Ridgefield
COUNTY OF FAIRFIELD  )

MICHAEL EDWARD BREEDE, being duly sworn, states as follows:

        1.     I am the husband of Patricia Minskoff Breede. My wife is the sole trustee

of the Maggie P. Minskoff QTIP Trust, which is the sole member of QCR 77 LLC, Scorpio 8283

LLC, and Gotham 9 LLC. My wife is also the sole trustee of the Maggie P. Minskoff Credit

Shelter Trust which is the sole member of Pisces 8283 LLC. QCR 77 LLC, Scorpio 8283 LLC,

Gotham 9 LLC, and Pisces 8283 LLC are limited liability companies that own partnership

interests in various real estate partnerships involved in this dispute. QCR 77 LLC is a partner in

77th Queens Associates; Scorpio 8283 LLC is a partner in Court-Martine Associates which, in

turn, is a partner in 82nd - 83rd Street Venture; Gotham 9 LLC is partner in 9th Street

Associates, and Pisces 8283 is a partner in 82nd - 83rd Street Venture. For the past several

years, I have served as my wife's representative in matters related to these partnerships and other partnerships in which she has an interest.

2.      Since at least January 2002, Jean Minskoff Grant, along with her husband Francis C. Grant III (collectively, the "Minskoff Grants"), have been managing the properties of 77th Queens Associates, 82nd - 83rd Street Venture, Halstead Harrison Avenue Venture, 9th Street Associates, and 29 Court Street Venture (the "Properties" and the "Partnerships," respectively) in addition to the properties of other partnerships in which my wife or other members of her family share interests.

3.      The Minskoff Grants and Minskoff Grant Realty & Management Corp. ("MGRMC") have done an excellent job managing the Properties.  They have been managing them efficiently, and have also introduced a number of innovations that have increased profitability, enhanced reporting, and generally improved the management of the properties. Among other things, MGRMC has worked to eliminate "inter-property loans" that were necessitated by the poor practices of the prior managers, decreased arrears, increased security deposits, and decreased vacancies.  MGRMC has also leveraged its banking relationships to obtain favorable mortgages for the Partnerships with debt and favorable interest rates for the Partnerships.  MGRMC has also improved the leases used by the Partnerships, and has attracted as tenants national retail establishments, including CVS and Starbucks, and banks such as Washington Mutual.  Quality tenants like these do not just walk in the door, they are a direct result of exceptional work by MGRMC.

4.      The Minskoff Grants and MGRMC have also kept the partners apprised of their management efforts, including sending detailed monthly property and management reports

and quarterly reports on each Property to all partners. Those reports inform the partners about bank account balances, payments and receivables, monthly rent roll, and include a status report on each Property.

5.      The Minskoff Grants and MGRMC have also consistently sought the approval of the partners before proceeding with any lease negotiations, and have developed an interactive process with partners of each Partnership regarding proposed leases. This process includes an analysis of each proposed tenant's viability along with proposed lease terms. MGRMC has presented an analysis to the applicable partners for approval before proceeding with lease negotiations. This has avoided the expenditure of unnecessary legal fees on the negotiation of leases that would not ultimately be approved, and has ensured that all partners have the opportunity to comment on potential leases.

6.      Over the years, there has been a steady deterioration in the relationships among the partners in the Partnerships, and the partners (and their spouses) have divided into camps. One camp is comprised of me and my wife along with the Minskoff Grants. The other camp is comprised of Sara Minskoff Allan, Robb Allan, Alan Minskoff, and Royanne Minskoff. Because of this deterioration, there has been broad recognition among those people, as well as others, that the Partnerships could not continue to operate constructively in their present form. As a result, there have been periodic efforts to negotiate some framework for dissolving the Partnerships and reallocating their assets among the partners. Throughout 2007 there were further efforts toward a negotiation, but these efforts did not go very far.

7.      Also, in late 2007, a handful of partners in three of the Partnerships (the "Revoking Partners") embarked on an effort to remove MGRMC as manager of the properties of

77th Queens Associates, 82nd - 83rd Street Venture, and Halstead Harrison Avenue Venture, and to replace MGRMC with Armstrong Realty Management, Corp. ("Armstrong"); the Revoking Partners have not attempted to remove MGRMC as managers of the properties of 9th Street Associates or 29 Court Street Venture.

   8. On November 30, 2007, at meetings of 77th Queens Associates, Court Martine Associates, and 82nd-83rd Street Venture, Robb Allan (as a representative of MYCA, LLC) raised the issue of replacing MGRMC with Armstrong. First at the 77th Queens Associates meetings, and then at the meetings of Court Martine Associates and 82nd-83rd Street Venture, I repeatedly voiced serious concerns on behalf of QCR 77 LLC, Scorpio 8283 LLC, and Pisces 8283 LLC regarding the ramifications of terminating a valid contract with MGRMC and with respect to Armstrong's qualifications. At the 77th Queens Associates Meeting, Mr. Allan responded to my concerns by assuring me that "obviously a management agreement [with Armstrong] needs to be circulated to members for approval prior to any signature. So we have some time between now and then." A transcript of the remarks made at the 77th Queens Associates meeting is attached as Exhibit A. This discussion was incorporated by reference at the Court Martine Associates and 82nd-83rd Street Venture meetings. I did not vote in favor of Mr. Allan's motion at either meeting. Additionally, despite Mr. Allan's assurance, I was not provided with a copy of the proposed agreement with Armstrong, and there was no further discussion at the partnership level about the matter.

   9. I did not receive a copy of any documents concerning the purported agreement with Armstrong until I received a fully executed copy of the Armstrong management agreements January 30, 2008. I was completely excluded from the purported hiring process.

10.     After these meetings, I asked MGRMC to send copies of its management agreements to Sara Minskoff Allan and Royanne Minskoff. MGRMC immediately complied with my request. The agreements with MGRMC were in every case executed by a majority of the partners of each respective partnership and previously distributed to all of the applicable partners.

11.     Additionally, the Revoking Partners commenced an action in New York State Supreme Court in New York County, purportedly on behalf of several partnerships, in further support of their effort to replace MGRMC with Armstrong. Although this action was purportedly commenced on behalf of partnerships in which Pisces 8283, Scorpio 8283 LLC, and QCR 77 LLC are members, neither my wife nor I were notified or consulted in any way regarding the filing of that action, and we object strenuously to its having been filed. We believe that action will not benefit the Partnerships but instead was intended by certain partners to further their own interests in disputes with other partners.

12.     Although Armstrong purportedly has assumed management responsibilities for certain Properties for the past three months, Armstrong has not provided any information whatsoever to me or certain other partners regarding the status of such Properties or the actions that it has taken with respect to them. More specifically, and for example, Armstrong has not provided any leasing or property updates, accounting for any funds it has received or the location of such funds, or management recommendations.

13.     I believe that MGRMC's management of the Properties has been highly competent and cost-effective. I believe that MGRMC has done an excellent job managing the Properties and is far better-suited than Armstrong to manage the Properties. Finally, I believe

that a change in property management will disrupt the management activities and increase

management costs. This is particularly inappropriate given that various partners have been

discussing the possibility of a "realignment" of interests that could result in the transfer of one or

more of the Partnerships to partners who strongly prefer MGRMC over Armstrong.

MICHAEL EDWARD BREEDE

Sworn to before me this
___ day of March, 2008

Notary Public

My Commission Expires
March 31, 2012

| | |
|---|---|
| *Rob Allan:* | Sorry. I'm going to have to repeat that. This is a partnership meeting of 77th Queens Associates. |
| | It's November 30th, 2007 3:34 P.M. East Coast time. The notice for this meeting was e-mailed to all of the partners on November 25th. The agenda that was proposed for this meeting was to discuss the status of current management and legal services. |
| | I'd like to start by calling the roll. On behalf of 2220 Equities Management LLP _____ Minskoff. |
| *Royanne Minskoff:* | Present. |
| *Rob Allan:* | On behalf of Minskoff Limited Partnership One, Jean Grant. |
| *Michael Breedy:* | Not present. |
| *Rob Allan:* | Present. On behalf of Mica LLC, Sara Minskoff Allan. |
| *Sara Minskoff:* | Present. |
| *Rob Allan:* | On behalf of – nope; wrong. QCR 77 LLC. |
| *Michael:* | Michael Breedy present. |
| *Rob Allan:* | I will take the two items on the agenda out of order a little bit and talk a little bit about the legal services for the partnership. |
| | We had a partnership meeting February to discuss legal representation of the partnership. As I recall at that time the partners approved a change in the legal representation; designated Royanne and myself to represent the partnership in discussion with an alternative law firm. |
| | _____ the time I believe Delbello was the firm that we recommended. Subsequent to the meeting an event occurred at Delbello that caused us to withdraw them as a candidate. I think I e-mailed everybody that one of the partners was indicted. _____ everybody's confidence. |
| | But having said that, we then interviewed Thelen Reid, which is where David Olisoff currently is. As everybody knows, David Olisoff has represented these partnerships in the past and we agreed to engage him. So, Thelen Reid is now representing this partnership. Is there any further information we need to have on this legal issue? |

| | |
|---|---|
| *Michael Breedy:* | No, I think that's correct. This is Michael Breedy. That's correct. Is there any question about representation? |
| *Rob Allan:* | I'm sorry? |
| *Michael Breedy:* | Is there any question about the legal representation by Thelen Reid? Why was this brought up as part of the agenda for this meeting? |
| *Rob Allan:* | Status report – we haven't had a partnership meeting since. |
| *Michael Breedy:* | Oh, so you're just memorializing that. |
| *Rob Allan:* | I think in the interest of the partners knowing what's going on in their own property that it's worth giving them a report. So it's simply a matter of bringing you all up to speed. |
| *Michael Breedy:* | Okay. One quick question. Is this recording just audio or is it available by written transcript? |
| *Rob Allan:* | It's only audio. I mean I suppose we could hire somebody to transcribe it. |
| *Michael Breedy:* | Okay. How long was that good for? |
| *Rob Allan:* | It's good for 90 days on the web page where it's posted. |
| *Michael Breedy:* | I'm sorry. Say that again. |
| *Rob Allan:* | It's good for 90 days on the web site. |
| *Michael Breedy:* | Oh. Do you have a web site? |
| *Rob Allan:* | It's the same web site all of the audio recordings – oh, you haven't been _____ where we've recorded – |
| *Michael Breedy:* | I don't have any. |
| *Rob Allan:* | Well, no, the ones that were recorded in February were recorded – it's done the same way. It's the same web page, same access code. |
| *Michael Breedy:* | Say it again. |
| *Rob Allan:* | It's the same web page as the February – |

| | |
|---|---|
| *Michael Breedy:* | Oh, I don't have that information. |
| *Rob Allan:* | _____ sent an e-mail to everybody instructing them, web page and ask for the identity of the specific recording and it's available for 90 days thereafter. |
| *Michael Breedy:* | Okay; fair enough. So I don't think there's any further question about Thelen Reid. |
| *Rob Allan:* | Sara? Royanne? |
| *Sara Minskoff Allan:* | No. |
| *Rob Allan:* | Okay. Moving on to the next item on the agenda. We have received a management proposal from a firm called Armstrong Realty Management, Inc., which we received both in electronic and written form. |
| | Unfortunately they misunderstood that our meetings were not in person and they sent me three boxes of Federal Expresses with written proposals in them and I have them here so I'll have to redistribute those by Federal Express over the weekend. |
| | But I did get electronic copies, which we circulated yesterday as soon as we got them. Michael, I believe you said you did. |
| *Michael Breedy:* | Well, I received it, but when you say they sent you some printed copies, did they contain the exhibits – the samples? |
| *Rob Allan:* | The answer is I haven't even looked at them because I walked into my office this morning and there were three boxes of them. So I can't tell you that. |
| *Michael Breedy:* | 'Cause it does say in the agreement that there was a sample flyer, sample checklist, sample statement and sample management report. |
| *Rob Allan:* | Hold on; let me go get one. |
| | Yeah, it has a variety of things. It has sample bank statements, sample Yardi reports, sample management contract, new property checklist; a whole series of things. There's quite a bit of additional addendum materials. Obviously it would be useful for everybody to have these. |
| *Michael Breedy:* | Correct. |

| | |
|---|---|
| *Rob Allan:* | I don't think they in any way pertain in any meaningful fashion to the contents of the electronic version. All of the terms are in that. |
| *Royanne Minskoff:* | Rob, since they use Yardi the reports are identical to the ones that we currently receive? |
| *Rob Allan:* | No, I think – let me look at them, but I think I recall that they were a little bit more expansive. Let me see. |
| | They've got the cash flows; they've got an income register, expense register, transaction register. They've got bank reconciliation, aged receivables, copies of bank statements. |
| | What I don't see in here is an arrearages report or some of the other things that I know you already generate. |
| *Royanne Minskoff:* | But we also saw in the presentation is that anything that Yardi produces we can request and have them really customize the reporting to exactly what we want. |
| *Rob Allan:* | I believe, Royanne, did you learn whether or not they had the full Yardi system as opposed to just parts of it? |
| *Royanne Minskoff:* | Yeah. |
| *Rob Allan:* | Alright; so they can customize it. Alright; that's great. |
| *Michael Breedy:* | So there was a presentation given by this firm? |
| *Rob Allan:* | No, I – |
| *Royanne Minskoff:* | No, I called them and asked them because you may not *[call interrupted]*. *[Beginning of audio repeats going up to 3:34 P.M.]* |
| | *[Call continues]* |
| | -- stalled and set that up in their office. So I'm familiar with the program. |
| *Michael Breedy:* | Okay. So no one's met with these people? |
| *Rob Allan:* | I've met with them. |
| *Royanne Minskoff:* | Oh, we've met with them; yeah. |

*Rob Allan:*    I met with them in New York. That's how we got the proposal. I mean it doesn't come over the transom. I solicited it. So that's the rationale.

What I can tell you personally that goes beyond the content of the document that you've received is that Mark Massey who's the principle of the firm, has been an operator in New York real estate for – what is it? Seventeen, 18 years and worked in Massey Knakal with his brother Paul.

I don't know if you know Paul or if you know Massey Knakal, but they have a first rate reputation for small property leasing –

*Michael Breedy:*    I'm aware of them, but I looked at his resume and I have several comments about the document. One of them here pertains to this point, which is that Massey's experience is as a sales broker.

*Rob Allan:*    Well, up until the time he started Armstrong that may be true.

*Michael Breedy:*    But that was only four years ago and they have four employees and they only manage 100,000 square feet of commercial space.

I have a project right now for 60,000 that I have myself.

*Rob Allan:*    No, no. I think you've misread it. In the first place he was doing management duties while he was at Massey Knakal beyond leasing, but he was primarily a leasing broker while he was there.

The properties that he has, apparently they're managing 25 properties with about 500 units that have 100,000 feet of commercial space, but the properties are mixed use and include residential as well.

*Michael Breedy:*    No, but to me that doesn't matter. Residential is not commercial and he's got only 100,000 square feet of commercial. It doesn't seem like a whole lot.

*Rob Allan:*    I don't know. How much are these properties? I don't think 77th is 100,000. I don't think the total of all our properties is 100,000. So, I'm not sure that that's particularly pertinent.

I think the qualifications are does he do a good job, does he have good references, are we satisfied with the facilities that he would bring to the table and what's his reputation.

**Michael Breedy:**   Again, I see four people here at the firm. The other guy, Fauntleroy is a sales rep and a financial analyst. He only started in management this year.

On page seven the office manager appears to have experience, but the rent collector joined the firm seven months ago and has experience in the hospitality industry.

My point is, and I have several more to make, but my point is this is one firm. Why aren't there others that have been solicited?

**Rob Allan:**   Others were solicited. One of the problems that you run into, Michael, as you can well imagine, is that when you're talking about small properties that have a half a dozen or a dozen store fronts, it's hard to find managers that have experience at that level.

I don't want to say experience at that level. It's hard to find managers willing to undertake smaller portfolios or properties with small retail spaces.

The large management firms are not interested and even if they were interested, I don't think any of us would want to find ourselves lost in some back room at some major management firm.

**Michael Breedy:**   Well, I agree with you there. Another point I was going to make was with respect to the brokerage firm that was recommended under this management agreement, Futerman. Futerman is a huge firm and I don't think we would get attention there, but in any case.

**Rob Allan:**   We're not discussing leasing at this point –

**Michael Breedy:**   What are all those recommendations then at the end of the proposal?

**Rob Allan:**   I agree, but let me make an observation about that. In the first place I think one of the advantages here is precisely the fact that Armstrong is not purporting to both provide management and leasing services.

They're purporting only to provide management services and we as owners will have the ability to choose any leasing agent that we choose.

They make recommendations, but we're not bound by those recommendations. That I think is a great advantage. It allows us

to pick the best people for each of the functions we want to have performed.

Now I don't entirely disagree with you about Futerman. On the other hand, I noticed that Minskoff Grant has recently been using Colliers a lot, which is a pretty big firm. So sometimes big firms can do better for you than small firms but that's a discussion to have separately. It's not really pertinent to the discussion of Armstrong.

*Michael Breedy:*    It says here – they refer on page 11 to a New Rochelle property. What is that property?

*Rob Allan:*    I'm looking for the reference.

*Michael Breedy:*    It says, "Our preliminary plan for the White Plains New Rochelle". It's listed twice under additional resources. This is the Queens property. They're talking about White Plains and New Rochelle. I don't understand that.

*Rob Allan:*    Well, I think that's just an artifact of the fact that I asked them to give us proposals on multiple properties. So they've obviously written some narrative that addresses all of them, but this proposal is for this property.

*Michael Breedy:*    Yeah, but it doesn't even refer to Queens. But in any case.

*Rob Allan:*    It doesn't matter. The point is whether the narrative parenthetically refers to somewhere else really doesn't pertain to what they're offering here.

*Michael Breedy:*    Now in their – page 16 the recommendations I wasn't very impressed with. At the end of the paragraph it just says, "We would also". Does anyone have any further language on that?

*Royanne Minskoff:*    Yeah; I called Mark Massey this morning and asked him if he knew that that sentence had been truncated. He said that the sentence should read, "We would also implement cost control measures to limit expenses while maintaining or enhancing services to existing tenants."

*Michael Breedy:*    I just think that's pretty sloppy.

*Rob Allan:*    Well, there's a typo in one of the other properties as well.

**Michael Breedy:** Well, the ground lease it says it expires in 2026, which isn't correct either.

I know it's just a proposal, but how would they lease these vacancies immediately?

**Rob Allan:** Well, first of all they're not the leasing agent so I can't tell you. The second thing is in terms of having accurate documentation for these properties, remember they have no documents on these properties. They are only privy to what we have told them at this point.

So they have no access to any of the ground leases or any other documents that's not in their possession. So if they've made an error, that's probably coming from me.

**Michael Breedy:** So all these services, these outside services on page 17, so are you saying I should just ignore those?

**Royanne Minskoff:** I don't think we should ignore them. I think the point here is that one of the benefits of hiring Armstrong is it gives us the ability to hire our own field work force as well as hiring our own leasing broker outside of the management firm.

**Michael Breedy:** For example, it doesn't make a whole lot of sense to have a maintenance person in Ozone Park for a property in Queens.

**Rob Allan:** I think that that's the kind of thing that we can discuss. You've got to remember right now that we pay for employees for these properties, above and beyond the management services that are provided and the management fees that are charged.

We have the option here to be able to engage an outside firm to provide field personnel or we could perhaps direct Armstrong to hire personnel on our behalf. I think that's a choice. I think it's something we can discuss. I don't think it's a disadvantage. I think if anything it's an advantage.

We finally will have the opportunity to fine tune how these properties operate and what the team is that's operating it.

I'm particularly excited at the idea that they don't purport to offer leasing services because that allows us to go pick the best leasing agent and if we find that they're not performing a satisfactory service we can dispose of them and get someone else. We don't even have that option now.

**Michael Breedy:**   Why not?

**Rob Allan:**   Well because the leasing is done by the same company that does the management.

**Michael Breedy:**   Well, we've got a management agreement. We don't have a leasing agreement.

**Rob Allan:**   It's part and parcel of the same company. Actually I've been disturbed to notice that the current management company's leasing division has been sub – what's the word I want to use?

**Female:**   Subcontract?

**Rob Allan:**   Subcontracting our leasing services to an outside firm that none of us have had an opportunity to talk to. In any case, this isn't a commentary about Minskoff Grant or its services. This is a proposal received from Armstrong that I think gives us greater flexibility and a greater opportunity to fine tune how we run these properties at a cheaper cost.

**Michael Breedy:**   I guess I have two final points. The first being I think it would be a good idea to get more than one company, one proposal. I've only had – well I've had less than 24 hours. I got the document about six, seven o'clock yesterday to even look at it.

Secondly, I don't know when you're proposing making a decision to replace current management, but as you're aware, the current management agreement which was approved by a majority of the partners was executed in April, 2000, requires notice by July 3rd for termination October 1st on an annual basis.

**Rob Allan:**   I wouldn't know that because I don't have a copy of the management agreement and have never been given one. So I couldn't tell you what the current management agreement says and Royanne –

**Royanne Minskoff:**   I don't have one.

**Rob Allan:**   -- I don't believe you have a copy of it either, do you?

**Royanne Minskoff:**   I don't have one either.

**Rob Allan:**   So we're operating on the basis of a partnership that doesn't even know what its own agreement is.

| | |
|---|---|
| *Michael Breedy:* | Well, I'm certainly – I've got a copy of it – I think I might have it online even, but I can certainly fax it over to you, but it was executed by ⸻, U.S. Trust and Jean on April 1ˢᵗ, 2000. |
| | Its termination at this point is annually; notice has to be given by – and I counted some dates here, but July 3ʳᵈ for termination October 1ˢᵗ of each year. |
| *Rob Allan:* | Do you have any idea of whether that signature constitutes a majority? |
| *Michael Breedy:* | Yes – |
| *Rob Allan:* | 'Cause I know that on some of the partnership agreements – |
| *Michael Breedy:* | On 77ᵗʰ Queens yes it does. It was done before some estate planning was completed on behalf of Marjorie's family. But, yes, it does. It also applies to successors. |
| *Royanne:* | So you're saying – well, let me just reflect that the time is 1:51. I would still like to see us come to some conclusion of a decision about Armstrong and related decisions. Then we would look to legal to deal with any issues in terms of the existing agreement. |
| *Michael Breedy:* | Well, I understand your point, but I don't think it would be wise to make a decision that, for example, to agree to sign on a management company when we have one in place. We may not be able to terminate until next – until October 1ˢᵗ of 2008. |
| *Rob Allan:* | Well, Michael – |
| *Michael Breedy:* | So, I think we should table this. I'm happy to distribute the document. We can revisit it at a subsequent meeting – |
| *Rob Allan:* | -- _____ motion to table – |
| *Michael Breedy:* | I think that's – no. It's a suggestion at this point. |
| *Rob Allan:* | I hear ya'. |
| *Michael Breedy:* | But I think that's the most prudent thing to do here. |

| | |
|---|---|
| *Rob Allan:* | Well, alright. So I'm going to call for a vote. Who wants to table this? Michael, I'm going to assume you're voting in the affirmative even though you're not saying anything. |
| *Michael Breedy:* | I would like to table this and I would strongly suggest that it does get tabled because you don't want to enter into an agreement. Obviously saying you're going to hire someone and signing them up are two different things. But I would not counsel to entering into an agreement with one company when we already have a management company. It's not a prudent thing to do. |
| *Rob Allan:* | Well, I don't think that's what the motion necessarily would actually say. So, let me – |
| *Michael Breedy:* | If you'd like to express the motion that's fine. |
| *Rob Allan:* | I'd to make a motion in the alternative. What I'd like to move is that we would hire Armstrong Realty Management effective January 1st of 2008 and that we would instruct Minskoff Grant to turn over to Armstrong all of the partnership assets, records, monies, keys, all partnership documents in their possession by the end of the year December 31st, 2007. |
| | I'd like to add to that that we instruct Minskoff Grant to cease all leasing activity effective immediately. |
| *Michael Breedy:* | So you want to have two management companies for ten months. |
| *Rob Allan:* | No, I'm not saying that and until I know for a fact that that's what the management agreement says, I'm not expressing an opinion as to whether it'll be for ten months or one month. |
| | I don't know what the management agreement says; don't have a copy of it; can't see what provisions it provides for us to terminate management. So until I see that I can't make a comment. |
| *Michael Breedy:* | And I think legally it would be prudent to take a look at the agreement before you agree to sign on any additional companies. |
| *Rob Allan:* | We're not signing anything today, Michael. |
| *Michael Breedy:* | But what you just said that you would hire them effective January 1st of '08. |

| | |
|---|---|
| *Rob Allan:* | We're authorizing that action. Obviously a management agreement needs to be circulated to members for approval prior to any signature. So we have some time between here and then. |
| *Michael Breedy:* | Well since there's time, again, I think it would be prudent to look at the document and then revisit this issue. You've got six weeks. |
| *Rob Allan:* | Why six? |
| *Michael Breedy:* | Ya' know, four, five, six weeks. I don't understand why it's so pressing to do right now. |
| *Rob Allan:* | We're trying to – I think – |
| *Royanne Minskoff:* | So there's no notification requirements. |
| *Rob Allan:* | No, if there's no – I don't know what the notification requirements are. I don't know what the termination requirements are. What I know is that the end of the year is coming up. |
| *Michael Breedy:* | Well, I can say to you that the notification is that it has to be – the notification has to be given by July 3rd for termination October 1st on an annual basis. |
| *Rob Allan:* | Well, I'm certain that there's somewhat more language than that with regard to termination. So, let me review it. I think we should all review it – |
| *Royanne Minskoff:* | Is that for cause, Michael, or is that just because – |
| *Michael Breedy:* | There is also a for cause provision, which I don't know verbatim, but I don't think you really want to get into that legal issue – |
| *Royanne Minskoff:* | I didn't say that. I was just asking the question. |
| *Michael Breedy:* | There is a for cause – |
| *Royanne Minskoff:* | Since you're at the advantage that you have the document and the rest of us don't that I don't see any reason why we can't move forward with a decision today until we find something to the contrary and then if that's what we have to live by then there isn't any damage done here either. |
| *Michael Breedy:* | Well, no, there's no damage done until a document gets executed with – |

*Royanne Minskoff:*  Correct.

*Michael Breedy:*  -- any subsequent management company.  I would definitely agree to that.

*Royanne Minskoff:*  Okay.

*Rob Allan:*  My point exactly.  All we're doing today is authorizing moving forward with retaining Armstrong as our manager and if we find that there's an obstacle to that process then obviously we'll have another meeting and we'll decide what to do.

*Royanne Minskoff:*  What I would suggest, Michael, is while it would be beneficial for all of us to have copies of the existing management agreement, it would be more important at this stage for David Olisoff to have a copy of it so he could advise us.

*Michael Breedy:*  Okay.  Well, what time is it?  Well, I should know that, shouldn't I?  It's about four.  I have to see if – I'm not sure I have it online.  So we'll see how that works.

But I will distribute it to – if everyone could give me an e-mail address they'd like it sent to I can arrange for that.  I can figure out Olisoff's.  Is it just the typical ones that I send to and who wants to receive it?

*Rob Allan:*  Property –

*Michael Breedy:*  Just one to you, Rob, and one to you Royanne?  Would that be sufficient?

*Royanne Minskoff:*  That would be great, Michael –

*Rob Allan:*  If you send it to Properties@helical.com Sara and I will both get it.

*Michael Breedy:*  So it's what?  Properties@ --

*Rob Allan:*  At helical.com.

*Michael Breedy:*  I think I have yours wrong, but okay.  So Properties@helical.com.

*Rob Allan:*  Right.

*Michael Breedy:*  Okay.  Now I just want to – before you make this decision I just want to point out again that if you look at the for cause, as a former lawyer, you're going to litigate that forever.  You might as well

just wait until next October. That's my opinion. You can do with it what you will.

**Royanne Minskoff:** I wasn't asking the question, Michael, because I was suggesting that that was a course of action. I was just asking if it was in the document.

**Michael Breedy:** Yeah. It's all very clear in the document.

**Royanne Minskoff:** Okay.

**Michael Breedy:** The provision I was referring to is like four lines. It's very succinct. But in any case I'll send the things on to you; if not today I'll do it on Monday or sometime over the weekend.

**Royanne Minskoff:** That's great.

**Michael Breedy:** And I'll send that one and getting ahead of myself any other properties – I mean I only have the two. I have that one and I have the one for 82nd/83rd.

**Rob Allan:** You have an advantage on us.

**Royanne Minskoff:** Yeah.

**Michael Breedy:** I wish – I do wish – I didn't know you didn't have them. I do wish that it was made public that you didn't have them.

**Rob Allan:** I think I wrote you an e-mail to that effect two or three months ago.

**Michael Breedy:** Oh, I don't remember seeing that, but in any case, there is a document and I'll send it and we're good to go.

Now I don't know if you want to formalize any of this, but I'll be quiet now.

**Rob Allan:** Alright. We have two minutes left in this meeting. So there is a motion on the table. I wanted to find out if anybody would be willing to second that motion. Do you want me to re-read it? What do you want me to do?

**Sara Minskoff Allan:** I'll second it.

**Rob Allan:** Well, actually I'm not an owner. I'm your proxy so you can't second your own motion.

| | |
|---|---|
| Royanne Minskoff: | It was my motion. |
| Rob Allan: | It was your motion?  I thought I was the one who – |
| Michael Breedy: | I _____ _____ _____. |
| Royanne Minskoff: | Oh, I'm sorry.  I'll second it. |
| Rob Allan: | Alright.  So in any case, we're just beating the formalities to death here. |
| Royanne Minskoff: | Alright; seconded. |
| Rob Allan: | Well, I think we have a motion and it's seconded.  Why don't we go ahead and vote on this so that at least we have a record of the disposition of it.  So, all in favor of the motion? |
| Royanne Minskoff: | Aye. |
| Rob Allan: | All against? |
| Michael Breedy: | Aye. |
| Rob Allan: | Alright.  So that's two to one and I think that's a majority.  So the motion carries.  I will at that point just make the observation that obviously we want to review the current management agreement and see what provisions it has that might affect this.  So the soonest we get that the better.  I hate to do this, but we are up – |
| Royanne Minskoff: | I'll move to adjourn – |
| Rob Allan: | -- against the next meeting where another partner may call in.  So I think what we should probably do is adjourn this meeting.  So I'll entertain a motion to do that. |
| Royanne Minskoff: | Move to adjourn. |
| Michael Breedy: | Seconded. |
| Rob Allan: | Any objection?  Alright.  Without objection we're adjourning and what I'm going to do is stop recording of this call now and then I will start it again for the next meeting.  Hold on. |

[End of Audio]

## CERTIFICATE OF SERVICE

The undersigned, a member in good standing of the bar of this Court, certifies that on

March 26, 2008, he caused a copy of the foregoing document to be served via e-mail, pursuant to

an agreement, upon the following:

Philip H. Gitlen
Whiteman Osterman & Hanna LLP
Once Commerce Plaza
Albany, New York  12260
pgitlen@woh.com


Christopher E. Buckley
Whiteman Osterman & Hanna LLP
Once Commerce Plaza
Albany, New York  12260
cbuckley@woh.com


Michael D. Lockard
Akin Gump Strauss Hauer Feld LLP
590 Madison Avenue
New York, New York  10022-2524
mlockard@akingump.com


Rebecca N. Loubriel
Akin Gump Strauss Hauer Feld LLP
590 Madison Avenue
New York, New York  10022-2524
rloubriel@akingump.com


                                        Thomas H. Golden