**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JEAN MINSKOFF GRANT, | : |
| Plaintiff, | : |
| -against- | : No. 08 CV 508 (CLB) |
|  | : **FILED BY ECF** |
| MYCA, LLC and 2220 EQUITIES MANAGEMENT | : |
| LIMITED PARTNERSHIP, | : |
| Defendants. | : |

|  |  |
|---|---|
| MLP I and QCR 77 LLC, | : |
| Plaintiffs, | : |
| -against- | : No. 08 CV 511 (CLB) |
|  | : **FILED BY ECF** |
| MYCA, LLC and 2220 EQUITIES MANAGEMENT | : |
| LIMITED PARTNERSHIP, | : |
| Defendants. | : |

## DECLARATION OF SARA MINSKOFF ALLAN
## IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION TO
## DISMISS PLAINTIFFS' SECOND CLAIMS FOR INJUNCTIVE RELIEF AND IN
## OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

SARA MINSKOFF ALLAN, being duly sworn, deposes and says:

1.      I am a member of MYCA, LLC, a Delaware limited liability company. MYCA is

a partner in each of the two New York general partnerships that are the subject of the above-

captioned litigations (the "Actions"), Halstead-Harrison Associates and 77th Queens Associates

(the "Partnerships"). MYCA owns a one-third partnership interest in each of the Partnerships.

The statements in this affidavit are based on my own personal knowledge. I am over the age of

majority and competent to testify to the matters described herein.

**The Functioning Majority**

2.      2220 Equities Management Limited Partnership ("2220 Equities") also is a partner in the Partnerships. 2220 Equities owns a one-third interest in Halstead-Harrison Associates and a one-quarter interest in 77th Queens Associates. As I discussed in my declaration in these Actions dated February 28, 2008, and as Royanne Minskoff, a principal of 2220 Equities, explained in her declaration in these Actions dated February 28, 2008, MYCA and 2220 Equities are in general agreement regarding the Partnerships and their properties. Both MYCA and 2220 Equities believe the Partnerships' properties should be managed by an independent, third-party managing agent and not by Minskoff Grant Realty & Management Corp. ("MGRMC").

3.      I understand that the plaintiffs in these Actions have asserted that deadlock exists in making decisions in the Partnerships. At meetings held on November 30, 2007, in the Partnerships, the Partnerships decided, pursuant to majority vote, to change the property manager for the Partnerships' properties. As the transcripts reflect, the Partnerships also decided in February 2007 to change general outside counsel. True and complete copies of transcripts of these November 30, 2007, meetings are attached hereto as Exhibit 1.

**Deficiencies In MGRMC's Management**

4.      For several years, Jean Minskoff Grant and her company, MGRMC, have exercised control over the management of properties owned by several Minskoff family real estate partnerships, including the Partnerships' properties. Grant is the Chief Operating Officer of MGRMC. Upon information and belief, Grant's husband Francis C. Grant III is the Chief Executive Officer of MGRMC. Upon information and belief, prior to her death, Grant's mother, Marjorie Minskoff Schleifer, was the owner of MGRMC and also owned or controlled

partnership interests now owned or controlled by her children and their spouses, Jean and Francis Grant, Alan and Royanne Minskoff, and James D. Sterling.

5.    MYCA has never executed any management agreement with MGRMC respecting the Partnerships or any other Minskoff family partnership in which MYCA is a partner.  In fact, MYCA has expressly refused to enter into any management agreement with MGRMC.

6.    MGRMC consistently has failed to provide MYCA and, upon information and belief, other partners in these and other Minskoff family real estate partnerships with full access to partnership books and records.  MGRMC also has not been responsive to MYCA's concerns and interests, and has blocked MYCA's opportunity to participate in decisions affecting these and other partnerships and properties.

7.    The following is not intended to be a full and complete recitation of each of MGRMC's deficiencies or MYCA's concerns with MGRMC.  Rather, it is only a summary of some of those concerns and a small number of examples.

### *The Purported Management Agreements*

8.    In approximately 2001, MYCA asked Grant to provide MYCA with executed copies of MGRMC's purported management agreement regarding the Partnerships' properties and other partnership properties.  Grant refused to do so unless MYCA agreed to sign the agreements.  MYCA refused to give its consent to MGRMC's management of the Partnerships' properties and Grant, in turn, refused to provide MYCA with copies of the purported agreements.

9.    At the time of the November 30, 2007, partnership meetings, MYCA still did not have copies of the purported management agreements.  *See* Exhibit 1 (77th Queens Associates transcript at 19:6-13).  Grant first provided MYCA with a copy of the executed purported management agreements with 77th Queens Associates and Halstead-Harrison Associates in December 2007.  This was after the Partnerships had voted to terminate MGRMC as manager of

3

the Partnerships' properties, and only at the request of Grant's ally, Michael Breede. A true and

correct copy of the purported management agreements provided in December 2007 are attached

hereto as Exhibit 2.

10.    The documents purport to be management agreements among MGRMC and the

Partnerships. The agreement relating to 77th Queens Associates is dated April 1, 2000, and

apparently was executed by Marjorie Minskoff Schleifer, Patricia Minskoff, and the United

States Trust Company of New York, purportedly on behalf of 77th Queens Associates, and by

Grant on behalf of MGRMC. The agreement relating to Halstead-Harrison Associates is dated

January 1, 2002, and apparently was executed by Marjorie Minskoff Schleifer and by Grant,

purportedly on behalf of Halstead-Harrison Associates, and Grant on behalf of MGRMC. As

noted above, upon information and belief, Marjorie Minskoff Schleifer was then the owner of

MGRMC as well as a partner in the Partnerships.

### *MGRMC's Failure To Provide Partnership Records*

11.    Grant has also refused to provide MYCA with other information and/or

documents relating to the Partnerships, the Partnerships' properties, and other Minskoff family

partnerships in which MYCA is a partner. A particularly egregious example occurred in May

2004. On May 13, 2004, MYCA, through its counsel, wrote a letter to Grant and MGRMC

seeking access to partnership books and records (for example, leases, mortgages, invoices,

receipts, bank account statements, check registers, journals, ledgers, tax returns, contracts, audits,

and correspondence) relating to the Partnerships and other Minskoff family partnerships in which

MYCA is a partner. In her May 24, 2004, response, Grant refused to permit MYCA access to the

requested records unless MYCA agreed to eight "Ground Rules." Among these ground rules,

Grant demanded that a security guard be present for the inspection, at MYCA's expense. Grant

also demanded that MYCA provide a $20,000 advance deposit. MYCA refused to limit its right to access the partnership books according to Grant's outlandish "Ground Rules." Grant, in turn, never dropped these so-called ground rules or allowed access to the requested materials, despite follow-up requests. A true and correct copy of Grant's May 24, 2004, letter is attached hereto as Exhibit 3.

12.    Grant and MGRMC have also refused to provide MYCA with requested lease agreements, financing agreements and other important partnership records on other occasions. At times when MGRMC ultimately complied with MYCA's requests, it often was only after repeated requests and long delays. Other times, documents were provided only after they were executed or rejected purportedly on behalf of the partnerships, impeding MYCA's ability to participate in partnership decisions.

13.    On or about December 30, 2007, for example, a partner in 9th Street Associates, another partnership in which MYCA is a partner and whose property MGRMC manages, offered either to buy or to sell the other partners' interests. MYCA requested from MGRMC copies of partnership records necessary to value the property and evaluate the offer. MGRMC provided only a portion of the requested documents before the offer expired, provided tenant leases for the property after the offer expired, and still has failed to provide much of the documents and information required to accurately assess the value of the property or interests in the partnership.

### *Property Reports and Budgets*

14.    Although MGRMC provides monthly and quarterly reports on properties it manages, these reports often either contain language recycled from prior reports or simply refer the partners back to prior reports. In addition, the reports frequently are the vehicle by which

MYCA first learns of actions MGRMC has already taken or agreements MGRMC has already entered into with regard to the properties, without advance notice or the opportunity to provide input.

15.     In other instances, Grant and MGRMC have refused to respond to MYCA's concerns or requests for additional information.  For example, Grant and MGRMC have circulated budgets to the partners in the Partnerships and other Minskoff family partnerships. Despite MYCA's requests, on various occasions Grant and MGRMC have refused to sufficiently explain budget items or the allotment of certain monies in MGRMC's annual budgets, often citing "past practice" or some other response without further detail or information.

### MGRMC Disregards Its Termination

16.     Although the Partnerships directed MGRMC to turn management of the Partnerships' properties over to a new, independent manager by January 1, 2008, MGRMC has refused to acknowledge the Partnerships' direction or MGRMC's termination.  For the past several months, MGRMC has continued to seek to exercise control over the Partnerships' bpls and records and their properties, including the Partnerships' bank accounts and tenant relationships.

17.     For example, upon information and belief, in the past month MGRMC, through Francis Grant, directed Josh Kimerling, Esq., of Cuddy & Feder LLP, to initiate an eviction proceeding against a tenant of a property owned by another Minskoff family partnership, 82nd-83rd Street Venture.  This was done without giving notice to MYCA and without its

approval, and despite directions from that partnership that MGRMC should cease holding itself out as an agent of the partnership. After learning of the eviction proceedings, MYCA sent correspondence through its counsel, Akin Gump Strauss Hauer & Feld LLP, to Mr. Kimerling specifically informing him that MGRMC's authority regarding that property had been terminated. A true and correct copy of the correspondence sent on behalf of MYCA is attached as Exhibit 4 to the Affidavit Of Michael D. Lockard In Further Support Of Defendants' Joint Motion To Dismiss The Plaintiffs' Second Claim For Injunctive Relief And In Opposition to Plaintiff's Cross-Motions For Summary Judgment, dated April 17, 2008.

18. As a result of the foregoing, MYCA continues to be dissatisfied with and disapproves of Grant's and MGRMC's management of the Partnerships' properties. MYCA does not trust Grant or MGRMC to respect partnership decisions made by the majority. MYCA also does not trust Grant and/or MGRMC to provide MYCA with sufficient information about the Partnerships' properties or access to Partnerships' records.

19. I declare under penalty of perjury that the foregoing is true and correct.

Executed:    April 17, 2008
            Palm Beach, Florida

Sara Minskoff Allan

8

# EXHIBIT 1

Page 1

1

2

3

4

5

6

7

8

9

10

11

12

13   Management Change Meeting - 2

14

15

16

17

18

19

20

21

22

23

24

25

## Page 2

1    [BEEP]
2    ROBB ALEY ALLAN: This is a meeting of
3  Halstead, uh, Harrison Associates. Uh, the date
4  is November 30th, the time is 3:06 p.m. East
5  Coast time. Uh, I'd like to call a roll of the
6  owners of Halstead-Harrison Venture. I have it
7  as both Venture and Associates. Uh, on behalf of
8  2220 Equities Management LP, Royanne Minskoff.
9    ROYANNE MINSKOFF: Present.
10    ROBB ALEY ALLAN: On behalf of Jean
11  Minskoff Grant. Uh, apparently not present. On
12  behalf of MYCA LLC, Sara Minskoff.
13    SARA MINSKOFF ALLAN: Present.
14    ROBB ALEY ALLAN: And I'm Robb Allan.
15  All right. We, uh, since the combined interests
16  of those present own 66 percent, we have a
17  quorum. Uh, I would like to suggest, uh, that we
18  might not begin this meeting for a few more
19  minutes to find out if Miss Grant is going to
20  have an opportunity to join us.
21    [BEEP]
22    ROBB ALEY ALLAN: Hello. Royanne?
23    ROYANNE MINSKOFF: It, I heard a, a
24  beep –
25    ROBB ALEY ALLAN: Me, too.

TSG Reporting - Worldwide    877-702-9580

## Page 3

1    ROYANNE MINSKOFF: - so it sounds like
2  somebody's joined us.
3    ROBB ALEY ALLAN: I thought, but I
4  haven't heard any voice.
5    JEAN MINSKOFF GRANT: Hello.
6    ROBB ALEY ALLAN: Ah, Jean. Welcome.
7  Uh, timing is perfect, we just started recording
8  the call. So I'm going to, uh, call you as part
9  of the roll. Jean Grant, are you present?
10    JEAN MINSKOFF GRANT: I am.
11    ROBB ALEY ALLAN: Okay, then we have
12  100 percent of the ownership for the Halstead-
13  Harrison Venture. Uh, we called this meeting,
14  uh, by notice of e-mail on November 25th, which
15  was sent out to all of the partners, uh, and the
16  agenda for the meeting was to discuss the status
17  of current management and legal services. To
18  take those in somewhat reverse order, I thought I
19  would bring everybody up to date on the status of
20  the legal representation of this property.
21    There was a meeting of the partners by
22  telephone in February, at which time a, uh,
23  majority voted to change the legal services of
24  the property, uh, and to designate a legal
25  committee, uh, comprised of Royanne Minskoff and

TSG Reporting - Worldwide    877-702-9580

## Page 4

1  myself, to identify alternative legal
2  representation. At the time, I think the, the
3  intended law firm that we had discussed was Del
4  Bello and subsequent –
5    JEAN MINSKOFF GRANT: Can you speak a
6  little bit louder.
7    ROBB ALEY ALLAN: I'm sorry?
8    JEAN MINSKOFF GRANT: Can you speak
9  louder.
10    ROBB ALEY ALLAN: Uh, at the time of
11  that meeting, I believe that the law firm that
12  was being considered was Del Bello and as I e-
13  mailed everybody about a week or 10 days later,
14  subsequent to that meeting there was an event at
15  Del Bello that undermined the confidence of some
16  of us in that as a choice of firm. And in the
17  alternative, we chose instead to engage Thiel &
18  Reed. And as a result, Dave Olisoff and Thiel &
19  Reed have now been conducting the legal affairs
20  of the property. Of the partnership, I should
21  say. Any further comments or questions on legal
22  representation?
23    All right. Well, in that case the next
24  issue on the agenda was a discussion of current
25  management. Uh, we have received a proposal for

TSG Reporting - Worldwide    877-702-9580

## Page 5

1  management services from a firm known as
2  Armstrong Realty Management, uh, the principal of
3  which is a fellow name Mark Massey, who's
4  affiliated with Massey Nackel, or was affiliated
5  with Massey Nackel. He obviously –
6    [OVERLAPPING VOICES]
7    JEAN MINSKOFF GRANT: Bob? Robb? I'm
8  calling in from England and when you move away
9  from the phone, I cannot hear you.
10    ROBB ALEY ALLAN: All right. Well, I'm
11  –
12    JEAN MINSKOFF GRANT: And I have not
13  seen any such proposal because I have not been a
14  place where I can get anything like e-mails.
15    [OVERLAPPING VOICES]
16    JEAN MINSKOFF GRANT: ... with the
17  five-day notice of the meeting.
18    ROBB ALEY ALLAN: I'm sorry? You were
19  cut off.
20    JEAN MINSKOFF GRANT: I didn't receive
21  anything attached to the five-day notice of the
22  meeting.
23    ROBB ALEY ALLAN: Correct. We received
24  –
25    [OVERLAPPING VOICES]

TSG Reporting - Worldwide    877-702-9580

## Page 6

1  JEAN MINSKOFF GRANT: Haven't seen any
2  such agreement and certainly I've never heard of
3  any firm called Armstrong in the New York area,
4  though I trust they exist.
5  ROBB ALEY ALLAN: All right. The –
6  JEAN MINSKOFF GRANT: But, uh, in
7  absence of the, uh, timely presence of any
8  proposal that I could review, it would seem to me
9  the best thing to do would be to postpone this
10  and I think it might be just common courtesy till
11  I'm back in the United States.
12  ROBB ALEY ALLAN: I, I'm, am I to
13  entertain that as a motion to postpone?
14  JEAN MINSKOFF GRANT: Motion to
15  postpone?
16  ROBB ALEY ALLAN: I'll take that as a
17  motion to postpone –
18  [OVERLAPPING VOICES]
19  JEAN MINSKOFF GRANT: I think that the
20  three partners having a discussion, this isn't
21  some major corporation. This is one store in the
22  town of Harrison, a partnership.
23  ROBB ALEY ALLAN: All right. Well, if
24  we're not going to –
25  JEAN MINSKOFF GRANT: It's not a

## Page 7

1  company.
2  [OVERLAPPING VOICES]
3  ROBB ALEY ALLAN: – if you don't want
4  to bother with the formalities of Roberts, then I
5  have heard your request to postpone. I'm not
6  inclined to do so. Does anybody else want to
7  postpone this meeting? All right, it doesn't
8  sound like anybody else does, so I think we
9  should go –
10  JEAN MINSKOFF GRANT: Maybe you won't
11  mind if I ask my lawyer to call in and, uh, he
12  can listen in.
13  ROBB ALEY ALLAN: Your lawyer can
14  listen in, but he can't participate.
15  JEAN MINSKOFF GRANT: Yes. Well, you
16  are not acting even with common business courtesy
17  of five days' notice. You're going to discuss a
18  management agreement. I am not in my office, I
19  don't have my own current management agreement to
20  check, um, all the rules and regs of that
21  governing document as of today. And I haven't
22  had one day to review any proposal from anybody
23  else.
24  ROBB ALEY ALLAN: Well, the –
25  JEAN MINSKOFF GRANT: And it isn't, if

## Page 8

1  it was a firm that somebody –
2  ROBB ALEY ALLAN: Why don't you be
3  quiet for a second and let me –
4  [OVERLAPPING VOICES]
5  JEAN MINSKOFF GRANT: – but I haven't
6  heard of this firm. How many employees do they
7  have, where are they located –
8  ROYANNE MINSKOFF: We can answer those
9  questions, Robb.
10  JEAN MINSKOFF GRANT: How many retail
11  operations do they manage? I mean, I don't know
12  anything.
13  ROBB ALEY ALLAN: We can answer those
14  questions.
15  JEAN MINSKOFF GRANT: Well, I, uh –
16  ROBB ALEY ALLAN: Jean has raised a
17  number of questions –
18  JEAN MINSKOFF GRANT: – I would like to
19  see a written document that shows they're
20  incorporated, that they have a license to
21  practice in New York, that they operate more
22  than, uh, 100,000 square feet, say, uh, that
23  they're not some fly-by-night organization that
24  just started less than five years ago. I'd, uh,
25  really like some proper information.

## Page 9

1  ROBB ALEY ALLAN: Well, if you'd be
2  quiet, perhaps we'd be able to tell you some of
3  that proper information. So I'd like you to hold
4  your questions for the moment till I finish
5  discussing the nature of the proposal that's been
6  received.
7  JEAN MINSKOFF GRANT: Well, I'd, I'd
8  actually now like to make a formal motion, that
9  in light of the lack of businesslike manner in
10  which you are planning to conduct this meeting,
11  it doesn't sound like it's Armstrong management,
12  it sounds like it's strong-arm management to me.
13  I want to propose a motion that the meeting be
14  postponed until all the partners can be on the
15  same continent, that all the partners can have
16  the same information in front of them and an
17  opportunity to review it, all partners can review
18  the documents with their own personal legal
19  counsel and review the existing governing
20  documents with their legal counsel.
21  ROBB ALEY ALLAN: Anybody wish to
22  second that motion?
23  JEAN MINSKOFF GRANT: Motion so
24  proposed.
25  ROBB ALEY ALLAN: Anybody wish to

**Page 10**

1　second that motion?
2　　　　JEAN MINSKOFF GRANT: Even though I
3　don't think any partnership needs to operate
4　under these –
5　　　　ROBB ALEY ALLAN: Jean, you need to be
6　quiet so it can be made and voted on. So is
7　there anybody willing to second that motion? All
8　right, motion is not passed.
9　　　　JEAN MINSKOFF GRANT: We're being
10　recorded. That's Robb? Are you recording this?
11　　　　ROBB ALEY ALLAN: Yes, I am.
12　　　　JEAN MINSKOFF GRANT: I heard when I
13　got on, it's the recording had started. I'd like
14　your assurance that timely access to the
15　recording will be made, unlike previous times
16　when it has taken months to get access to
17　recordings from you and your co-partner.
18　　　　ROBB ALEY ALLAN: You're factually
19　incorrect. Recordings were available immediately
20　–
21　　　　[OVERLAPPING VOICES]
22　　　　JEAN MINSKOFF GRANT: I have it, I have
23　all the documentation. You should know me, Robb.
24　I am very well documented.
25　　　　ROBB ALEY ALLAN: All right. And on

TSG Reporting - Worldwide　　877-702-9580

**Page 11**

1　that basis, we'll move forward. The management
2　proposal that was received was distributed to all
3　of the partners by e-mail yesterday. It was
4　received electronically –
5　　　　[OVERLAPPING VOICES]
6　　　　JEAN MINSKOFF GRANT: ... that is not
7　in five business days. I can't get an answer
8　from you guys in 40 business days -
9　　　　ROBB ALEY ALLAN: I have the floor,
10　would you please be quiet?
11　　　　JEAN MINSKOFF GRANT: - and you wanted
12　me to look at something from e-mail and I'm not
13　in, I'm not even in New York City.
14　　　　ROBB ALEY ALLAN: Jean, you're being
15　disruptive. Would you please be quiet so we can
16　conduct the meeting here.
17　　　　JEAN MINSKOFF GRANT: You know
18　something? I can be disruptive and there won't
19　be a meeting. Because I think that, uh, this is
20　a very unpleasant way for adults to attempt to
21　railroad in whatever it is they think they can
22　do. Someone who lives in Boise, Idaho and
23　somebody who lives in Palm Beach, Florida think
24　that they can manage properties in New York.
25　That's fine. You think you can do it. Well, so

TSG Reporting - Worldwide　　877-702-9580

**Page 12**

1　show me. You have one proposal or you have three
2　proposals.
3　　　　[OVERLAPPING VOICES]
4　　　　ROYANNE MINSKOFF: I'd like to make a
5　motion to hire Armstrong effective January 1st to
6　be the management company for Halstead and
7　Harrison. I'd also like to instruct Minskoff
8　Grant to deliver Armstrong all partnership assets
9　and records and documents by December 31st, 2007.
10　Further, I'd like to instruct Minskoff Grant
11　Realty Management [BEEP] to cease all leasing
12　activity eff, effective immediately. Is there a
13　second?
14　　　　SARA MINSKOFF ALLAN: I'll second.
15　　　　ROBB ALEY ALLAN: All in favor?
16　　　　VOICES: Aye.
17　　　　ROBB ALEY ALLAN: Any objections? So
18　passed. I believe, by the way, that Jean Grant
19　hung up in the course of you making that motion.
20　　　　ROYANNE MINSKOFF: Robb, would you,
21　Robb, let's call for a motion to adjourn.
22　　　　ROBB ALEY ALLAN: All right. On that
23　basis, I will entertain a motion to adjourn.
24　Sara?
25　　　　SARA MINSKOFF ALLAN: Second.

TSG Reporting - Worldwide　　877-702-9580

**Page 13**

1　　　　ROBB ALEY ALLAN: Uh, any objection?
2　We are adjourned, I'm stopping recording.
3　　　　[END OF TAPE]
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide　　877-702-9580



Page 14

1   A Plus Recording and Transcribing, a division of
2   A Plus Office Support Systems, states that the
3   preceding transcript was created by one of its
4   employees using standard electronic transcription
5   equipment and is a true and accurate record of
6   the audio on the provided media to the best of
7   that employee's ability.  The media from which we
8   worked was provided to us. We can make no
9   statement as to its authenticity.
10
11      Attested to by:
12
13
14      Patrick Weaver
15
16
17
18
19
20
21
22
23
24
25

## A

**ability (1)**
14:7
**able (1)**
9:2
**absence (1)**
6:7
**access (2)**
10:14,16
**accurate (1)**
14:5
**acting (1)**
7:16
**activity (1)**
12:12
**adjourn (2)**
12:21,23
**adjourned (1)**
13:2
**adults (1)**
11:20
**affairs (1)**
4:19
**affiliated (2)**
5:4,4
**agenda (2)**
3:16 4:24
**ago (1)**
8:24
**agreement (3)**
6:2 7:18,19
**Ah (1)**
3:6
**ALEY (36)**
2:2,10,14,22,25 3:3,6
3:11 4:7,10 5:10,18
5:23 6:5,12,16,23
7:3,13,24 8:2,13,16
9:1,21,25 10:5,11
10:18,25 11:9,14
12:15,17,22 13:1
**Allan (40)**
2:2,10,13,14,14,22,25
3:3,6,11 4:7,10 5:10
5:18,23 6:5,12,16
6:23 7:3,13,24 8:2
8:13,16 9:1,21,25
10:5,11,18,25 11:9
11:14 12:14,15,17
12:22,25 13:1
**alternative (2)**

4:1,17
**answer (3)**
8:8,13 11:7
**anybody (6)**
7:6,8,22 9:21,25 10:7
**apparently (1)**
2:11
**area (1)**
6:3
**Armstrong (5)**
5:2 6:3 9:11 12:5,8
**assets (1)**
12:8
**Associates (2)**
2:3,7
**assurance (1)**
10:14
**attached (1)**
5:21
**attempt (1)**
11:20
**Attested (1)**
14:11
**audio (1)**
14:6
**authenticity (1)**
14:9
**available (1)**
10:19
**Aye (1)**
12:16

## B

**back (1)**
6:11
**basis (2)**
11:1 12:23
**Beach (1)**
11:23
**beep (4)**
2:1,21,24 12:11
**behalf (3)**
2:7,10,12
**believe (2)**
4:11 12:18
**Bello (3)**
4:4,12,15
**best (2)**
6:9 14:6
**bit (1)**
4:6

**Bob (1)**
5:7
**Boise (1)**
11:22
**bother (1)**
7:4
**bring (1)**
3:19
**business (3)**
7:16 11:7,8
**businesslike (1)**
9:9

## C

**call (5)**
2:5 3:8,8 7:11 12:21
**called (2)**
3:13 6:3
**calling (1)**
5:8
**case (1)**
4:23
**cease (1)**
12:11
**certainly (1)**
6:2
**change (2)**
1:13 3:23
**check (1)**
7:20
**choice (1)**
4:16
**chose (1)**
4:17
**City (1)**
11:13
**Coast (1)**
2:5
**combined (1)**
2:15
**comments (1)**
4:21
**committee (1)**
3:25
**common (2)**
6:10 7:16
**company (2)**
7:1 12:6
**comprised (1)**
3:25
**conduct (2)**

9:10 11:16
**conducting (1)**
4:19
**confidence (1)**
4:15
**considered (1)**
4:12
**continent (1)**
9:15
**corporation (1)**
6:21
**Correct (1)**
5:23
**counsel (2)**
9:19,20
**course (1)**
12:19
**courtesy (2)**
6:10 7:16
**co-partner (1)**
10:17
**created (1)**
14:3
**current (3)**
3:17 4:24 7:19
**cut (1)**
5:19

## D

**date (2)**
2:3 3:19
**Dave (1)**
4:18
**day (1)**
7:22
**days (4)**
4:13 7:17 11:7,8
**December (1)**
12:9
**Del (1)**
4:3,12,15
**deliver (1)**
12:8
**designate (1)**
3:24
**discuss (2)**
3:16 7:17
**discussed (1)**
4:3
**discussing (1)**
9:5

**discussion (2)**
4:24 6:20
**disruptive (2)**
11:15,18
**distributed (1)**
11:2
**division (1)**
14:1
**document (2)**
7:21 8:19
**documentation (1)**
10:23
**documented (1)**
10:24
**documents (3)**
9:18,20 12:9

## E

**e (1)**
4:12
**East (1)**
2:4
**eff (1)**
12:12
**effective (2)**
12:5,12
**electronic (1)**
14:4
**electronically (1)**
11:4
**employees (2)**
8:6 14:4
**employee's (1)**
14:7
**engage (1)**
4:17
**England (1)**
5:8
**entertain (2)**
6:13 12:23
**equipment (1)**
14:5
**Equities (1)**
2:8
**event (1)**
4:14
**everybody (2)**
3:19 4:13
**exist (1)**
6:4
**existing (1)**

9:19
e-mail (3)
3:14 11:3,12
e-mails (1)
5:14

_____ F _____
factually (1)
10:18
favor (1)
12:15
February (1)
3:22
feet (1)
8:22
fellow (1)
5:3
find (1)
2:19
fine (1)
11:25
finish (1)
9:4
firm (7)
4:3,11,16 5:1 6:3 8:1
  8:6
five (3)
7:17 8:24 11:7
five-day (2)
5:17,21
floor (1)
11:9
Florida (1)
11:23
fly-by-night (1)
8:23
formal (1)
9:8
formalities (1)
7:4
forward (1)
11:1
front (1)
9:16
further (2)
4:21 12:10

_____ G _____
go (1)
7:9
going (4)

2:19 3:8 6:24 7:17
governing (2)
7:21 9:19
Grant (35)
2:11,19 3:5,9,10 4:5,8
  5:7,12,16,20 6:1,6
  6:14,19,25 7:10,15
  7:25 8:5,10,15,18
  9:7,23 10:2,9,12,22
  11:6,11,17 12:8,10
  12:18
guys (1)
11:8

_____ H _____
Halstead (3)
2:3 3:12 12:6
Halstead-Harrison ...
2:6
Harrison (4)
2:3 3:13 6:22 12:7
hear (1)
5:9
heard (6)
2:23 3:4 6:2 7:5 8:6
  10:12
Hello (2)
2:22 3:5
hire (1)
12:5
hold (1)
9:3
hung (1)
12:19

_____ I _____
Idaho (1)
11:22
identify (1)
4:1
immediately (2)
10:19 12:12
inclined (1)
7:6
incorporated (1)
8:20
incorrect (1)
10:19
information (3)
8:25 9:3,16
instruct (2)

12:7,10
intended (1)
4:3
interests (1)
2:15
issue (1)
4:24

_____ J _____
January (1)
12:5
Jean (36)
2:10 3:5,6,9,10 4:5,8
  5:7,12,16,20 6:1,6
  6:14,19,25 7:10,15
  7:25 8:5,10,15,16
  8:18 9:7,23 10:2,5,9
  10:12,22 11:6,11,14
  11:17 12:18
join (1)
2:20
joined (1)
3:2

_____ K _____
know (3)
8:11 10:23 11:17
known (1)
5:1

_____ L _____
lack (1)
9:9
law (2)
4:3,11
lawyer (2)
7:11,13
leasing (1)
12:11
legal (9)
3:17,20,23,24 4:1,19
  4:21 9:18,20
let's (1)
12:21
license (1)
8:20
light (1)
9:9
listen (2)
7:12,14
little (1)

4:6
lives (2)
11:22,23
LLC (1)
2:12
located (1)
8:7
look (1)
11:12
louder (2)
4:6,9
LP (1)
2:8

_____ M _____
mailed (1)
4:13
major (1)
6:21
majority (1)
3:23
making (1)
12:19
manage (2)
8:11 11:24
management (13)
1:13 2:8 3:17 4:25 5:1
  5:2 7:18,19 9:11,12
  11:1 12:6,11
manner (1)
9:9
Mark (1)
5:3
Massey (3)
5:3,4,5
mean (1)
8:11
media (2)
14:6,7
meeting (15)
1:13 2:2,18 3:13,16
  3:21 4:11,14 5:17
  5:22 7:7 9:10,13
  11:16,19
mind (1)
7:11
Minskoff (44)
2:8,9,11,12,13,23 3:1
  3:5,10,25 4:5,8 5:7
  5:12,16,20 6:1,6,14
  6:19,25 7:10,15,25

8:5,8,10,15,18 9:7
9:23 10:2,9,12,22
11:6,11,17 12:4,7
12:10,14,20,25 5
minutes (1)
2:19
moment (1)
9:4
months (1)
10:16
motion (14)
6:13,14,17 9:8, 13,22
  9:23 10:1,7,8 12:5
  12:19,21,23
move (2)
5:8 11:1
MYCA (1)
2:12

_____ N _____
Nackel (2)
5:4,5
name (1)
5:3
nature (1)
9:5
need (1)
10:5
needs (1)
10:3
never (1)
6:2
New (4)
6:3 8:21 11:13,24
notice (4)
3:14 5:17,21 7:17
November (2)
2:4 3:14
number (1)
8:17

_____ O _____
objection (1)
13:1
objections (1)
12:17
obviously (1)
5:5
office (2)
7:18 14:2
Okay (1)

3:11
**Olisoff (1)**
4:18
**operate (2)**
8:21 10:3
**operations (1)**
8:11
**opportunity (2)**
2:20 9:17
**order (1)**
3:18
**organization (1)**
8:23
**OVERLAPPING (9)**
5:6,15,25 6:18 7:2 8:4
  10:21 11:5 12:3
**owners (1)**
2:6
**ownership (1)**
3:12

**P**

**Palm (1)**
11:23
**part (1)**
3:8
**participate (1)**
7:14
**partners (7)**
3:15,21 6:20 9:14,15
  9:17 11:3
**partnership (4)**
4:20 6:22 10:3 12:8
**passed (2)**
10:8 12:18
**Patrick (1)**
14:14
**percent (2)**
2:16 3:12
**perfect (1)**
3:7
**personal (1)**
9:18
**phone (1)**
5:9
**place (1)**
5:14
**planning (1)**
9:10
**please (2)**
11:10,15

**Plus (2)**
14:1,2
**postpone (6)**
6:9,13,15,17 7:5,7
**postponed (1)**
9:14
**practice (1)**
8:21
**preceding (1)**
14:3
**presence (1)**
6:7
**present (5)**
2:9,11,13,16 3:9
**previous (1)**
10:15
**principal (1)**
5:2
**proper (2)**
8:25 9:3
**properties (1)**
11:24
**property (3)**
3:20,24 4:20
**proposal (7)**
4:25 5:13 6:8 7:22 9:5
  11:2 12:1
**proposals (1)**
12:2
**propose (1)**
9:13
**proposed (1)**
9:24
**provided (2)**
14:6,8
**p.m (1)**
2:4

**Q**

**questions (5)**
4:21 8:9,14,17 9:4
**quiet (5)**
8:3 9:2 10:6 11:10,15
**quorum (1)**
2:17

**R**

**railroad (1)**
11:21
**raised (1)**
8:16

**really (1)**
8:25
**Realty (2)**
5:2 12:11
**receive (1)**
5:20
**received (5)**
4:25 5:23 9:6 11:2,4
**record (1)**
14:5
**recorded (1)**
10:10
**recording (6)**
3:7 10:10,13,15 13:2
  14:1
**recordings (2)**
10:17,19
**records (1)**
12:9
**Reed (2)**
4:18,19
**regs (1)**
7:20
**representation (3)**
3:20 4:2,22
**request (1)**
7:5
**result (1)**
4:18
**retail (1)**
8:10
**reverse (1)**
3:18
**review (5)**
6:8 7:22 9:17,17,19
**right (9)**
2:15 4:23 5:10 6:5,23
  7:7 10:8,25 12:22
**Robb (43)**
2:2,10,14,14,22,25
  3:3,6,11 4:7,10 5:7
  5:10,18,23 6:5,12
  6:16,23 7:3,13,24
  8:2,9,13,16 9:1,21
  9:25 10:5,10,11,18
  10:23,25 11:9,14
  12:15,17,20,21,22
  13:1
**Roberts (1)**
7:4
**roll (2)**

2:5 3:9
**Royanne (9)**
2:8,9,22,23 3:1,25 8:8
  12:4,20
**rules (1)**
7:20

**S**

**Sara (5)**
2:12,13 12:14,24,25
**second (7)**
8:3 9:22 10:1,7 12:13
  12:14,25
**see (1)**
8:19
**seen (2)**
5:13 6:1
**sent (1)**
3:15
**services (3)**
3:17,23 5:1
**show (1)**
12:1
**shows (1)**
8:19
**somebody (2)**
8:1 11:23
**somebody's (1)**
3:2
**somewhat (1)**
3:18
**sorry (2)**
4:7 5:18
**sound (2)**
7:8 9:11
**sounds (2)**
3:1 9:12
**speak (2)**
4:5,8
**square (1)**
8:22
**standard (1)**
14:4
**started (3)**
3:7 8:24 10:13
**statement (1)**
14:9
**states (2)**
6:11 14:2
**status (2)**
3:16,19

**stopping (1)**
13:2
**store (1)**
6:21
**strong-arm (1)**
9:12
**subsequent (2)**
4:4,14
**suggest (1)**
2:17
**Support (1)**
14:2
**Systems (1)**
14:2

**T**

**take (2)**
3:18 6:16
**taken (1)**
10:16
**TAPE (1)**
13:3
**telephone (1)**
3:22
**tell (1)**
9:2
**Thiel (2)**
4:17,18
**thing (1)**
6:9
**think (9)**
4:2 6:10,19 7:8 10:3
  11:19,21,23,25
**thought (2)**
3:3,18
**three (2)**
6:20 12:1
**till (2)**
6:10 9:4
**time (5)**
2:4,5 3:22 4:2,10
**timely (2)**
6:7 10:14
**times (1)**
10:15
**timing (1)**
3:7
**today (1)**
7:21
**town (1)**
6:22

**Transcribing (1)**
14:1
**transcript (1)**
14:3
**transcription (1)**
14:4
**true (1)**
14:5
**trust (1)**
6:4

---
**U**
---
**uh (28)**
2:3,3,5,7,11,15,17,17
  3:7,8,13,14,15,22
  3:24,25 4:10,25 5:2
  6:6,7 7:11 8:15,22
  8:22,24 11:19 13:1
**um (1)**
7:20
**undermined (1)**
4:15
**United (1)**
6:11
**unpleasant (1)**
11:20

---
**V**
---
**Venture (3)**
2:6,7 3:13
**voice (1)**
3:4
**VOICES (10)**
5:6,15,25 6:18 7:2 8:4
  10:21 11:5 12:3,16
**voted (2)**
3:23 10:6

---
**W**
---
**want (3)**
7:3,6 9:13
**wanted (1)**
11:11
**way (2)**
11:20 12:18
**Weaver (1)**
14:14
**week (1)**
4:13
**Welcome (1)**
3:6

**we'll (1)**
11:1
**we're (2)**
6:24 10:9
**willing (1)**
10:7
**wish (2)**
9:21,25
**worked (1)**
14:8
**written (1)**
8:19

---
**Y**
---
**years (1)**
8:24
**yesterday (1)**
11:3
**York (4)**
6:3 8:21 11:13,24

---
**1**
---
**1st (1)**
12:5
**10 (1)**
4:13
**100 (1)**
3:12
**100,000 (1)**
8:22

---
**2**
---
**2 (1)**
1:13
**2007 (1)**
12:9
**2220 (1)**
2:8
**25th (1)**
3:14

---
**3**
---
**3:06 (1)**
2:4
**30th (1)**
2:4
**31st (1)**
12:9

---
**4**
---
**40 (1)**

11:8

---
**6**
---
**66 (1)**
2:16

Page 1

1
2
3
4
5
6
7
8
9
10
11
12
13      Management Change Meeting - 3
14
15
16
17
18
19
20
21
22
23
24
25

## Page 2

1    [BEEP]
2        MICHAEL BREEDE: Well, there you go
3    [LAUGHS].
4        ROBB ALEY ALLAN: All right. I'm going
5    to have to repeat that. Uh, this is a
6    partnership meeting of 77th Queens Associates.
7    It's November 30th, 2007, 3:34 p.m. East Coast
8    time. Uh, the notice for this meeting was e-
9    mailed to all of the partners on November 25th
10   and the agenda that was proposed for this meeting
11   was to discuss the status of current management
12   and legal services.
13       I'd like to start by calling the roll.
14   On behalf of 2220 Equities Management LP,
15   [UNINTEL] Minskoff.
16       ROYANNE MINSKOFF?: Present.
17       ROBB ALEY ALLAN: All right. On behalf
18   of Jean – no, excuse me, on behalf of Minskoff
19   Limited Partnership 1, Jean Grant.
20       MICHAEL BREEDE: Not present.
21       ROBB ALEY ALLAN: [MISSING WORD?]
22   Present. On behalf of MYCA LLC, Sara Minskoff
23   Allan.
24       SARA MINSKOFF ALLAN: Present.
25       ROBB ALEY ALLAN: On behalf of – nope,

TSG Reporting - Worldwide      877-702-9580

## Page 3

1    wrong, QCR 77 LLC.
2        MICHAEL BREEDE: Uh, Michael Breede,
3    present.
4        ROBB ALEY ALLAN: Uh, I will, uh, take
5    the two items on the agenda out of order a little
6    bit and talk a little bit about the legal
7    services for the partnership. We had a
8    partnership meeting [WORD MISSING?] February to
9    discuss legal representation of the partnership
10   and as I recall, at that time the partners
11   approved a change in the legal representation,
12   designated Royanne and myself to represent the
13   partnership in discussion with an alternative law
14   firm. At the time I believe Del Bello was the
15   firm that we recommended and subsequent to the
16   meeting, uh, an event occurred at Del Bello that
17   caused us to withdraw them as a candidate. Uh, I
18   think I e-mailed everybody that one of the
19   partners was indicted [WORD MISSING?] undermined
20   everybody's confidence.
21       But having said that, we then
22   interviewed Thiel & Reed, which is where David
23   Olisoff currently is, and as everybody knows,
24   David Olisoff has represented these partnerships
25   in the past and we agreed to engage him. So

TSG Reporting - Worldwide      877-702-9580

## Page 4

1    Thiel & Reed is now representing this
2    partnership. Is there any further information we
3    need to have on this legal issue?
4        MICHAEL BREEDE: Well, I, no, I think
5    that's correct. This is Michael Breede. This,
6    that's correct. Um, is there any question about
7    the representation?
8        ROBB ALEY ALLAN: I'm sorry?
9        MICHAEL BREEDE: Is that any question
10   about the legal representation by Thiel & Reed?
11   Why, why, why was this brought up as part of the
12   agenda for this meeting?
13       ROBB ALEY ALLAN: Status report. We
14   haven't had a partnership meeting since.
15       MICHAEL BREEDE: Oh, so you're just
16   memorializing that.
17       ROBB ALEY ALLAN: Yeah, I think in the
18   interests of the partners knowing what's going on
19   in their own property, that it's worth giving
20   them a report. So I'm, it's simply a matter of
21   bringing you all up to speed.
22       MICHAEL BREEDE: Okay. One, one quick
23   question. Um, is this recording just, uh, audio?
24   Or is it available by written transcript?
25       ROBB ALEY ALLAN: It's only audio. I

TSG Reporting - Worldwide      877-702-9580

## Page 5

1    mean, I suppose we could hire somebody to
2    transcribe it.
3        MICHAEL BREEDE: Okay. How long is
4    that good for?
5        ROBB ALEY ALLAN: It's good for 90 days
6    on the Web page where it's posted.
7        MICHAEL BREEDE: I'm sorry, say that
8    again?
9        ROBB ALEY ALLAN: It's good for 90 days
10   on the Website.
11       MICHAEL BREEDE: Uh, do you have a
12   Website?
13       ROBB ALEY ALLAN: It's the same Website
14   all of the audio recordings – oh, you haven't
15   been –
16       [OVERLAPPING VOICES]
17       MICHAEL BREEDE: I don't have any.
18   Heh-heh.
19       ROBB ALEY ALLAN: Well, no, the ones
20   that were recorded in February were recorded –
21   it's done the same way, it's the same Web page,
22   same access code.
23       MICHAEL BREEDE: Well, say it again?
24       ROBB ALEY ALLAN: It's the same Web
25   page as the February.

TSG Reporting - Worldwide      877-702-9580

## Page 6

1  MICHAEL BREEDE: Oh, I don't have that
2  information, but okay.
3  ROBB ALEY ALLAN: ... sent an e-mail to
4  everybody instructing them, Web page, and as to
5  the identity of the specific recording and it's
6  available for 90 days thereafter.
7  MICHAEL BREEDE: Okay, fair enough.
8  Um, so no, I don't think there's any further
9  question about Thiel & Reed.
10  ROBB ALEY ALLAN: Sara? Royanne?
11  SARA MINSKOFF ALLAN: No.
12  ROBB ALEY ALLAN: Okay. Moving on to
13  the next item on the agenda. Uh, we have
14  received a management proposal from a firm called
15  Armstrong Realty Management Inc., which we
16  received both in electronic and written form.
17  Unfortunately, they misunderstood that our
18  meetings were not in person and they sent me
19  three boxes of Federal Expresses with written
20  proposals in them and I have them here. So I'll
21  have to redistribute those by Federal Express
22  over the weekend. But I did get electronic
23  copies, which we circulated yesterday as soon as
24  we got them. And Michael, I believe you said you
25  did?

## Page 7

1  MICHAEL BREEDE: Well, I received it
2  but when say they, they sent you some printed
3  copies, uh, did they contain the exhibits? The
4  samples?
5  ROBB ALEY ALLAN: The answer is I
6  haven't even looked at them because I walked into
7  my office this morning and there were three boxes
8  of them. So I can't tell you that.
9  MICHAEL BREEDE: Because it does say in
10  the agreement that there was a sample flyer,
11  sample checklist, sample statement and sample
12  management report.
13  ROBB ALEY ALLAN: Hold on, let me go
14  get one. [PAUSE] Yeah, it has a variety of
15  things. It has sample bank statements, sample
16  Yardi reports, uh, sample management contract,
17  new property checklists, it's a whole series of
18  things. It's quite a bit of additional addenda
19  material. So obviously it would be useful for
20  everybody to have these.
21  MICHAEL BREEDE: Correct.
22  ROBB ALEY ALLAN: I don't think they
23  [UNINTEL] uh, in any way, uh, pertain in any
24  meaningful fashion to the contents of the
25  electronic version. All of the terms are in

## Page 8

1  that.
2  ROYANNE MINSKOFF: Robb, since they use
3  Yardi, um, the reports are identical to the ones
4  that we currently receive?
5  ROBB ALEY ALLAN: No, I think – let me
6  look at them, but I think I recall that they were
7  a little bit more expansive. Let me see.
8  They've got the cash flows, they've got an income
9  register, expense register, transaction register.
10  They've got bank reconciliation, aged
11  receivables, copies of bank statements. Uh, what
12  I don't see in here is an arrearages report or
13  some of the other things that I know you already
14  generate, so –
15  ROYANNE MINSKOFF: But what we also saw
16  in the, uh, in the presentation is that anything
17  that Yardi produces, we can, we can request and
18  have, have them really customize the reporting to
19  exactly what we want.
20  ROBB ALEY ALLAN: I believe, Royanne,
21  did you learn whether or not they had the full
22  Yardi system as opposed to just parts of it?
23  ROYANNE MINSKOFF: Yeah.
24  ROBB ALEY ALLAN: All right. So they
25  can customize it. All right, that's great.

## Page 9

1  MICHAEL BREEDE: So there was a
2  presentation given by this firm?
3  ROBB ALEY ALLAN: No, I mean –
4  ROYANNE MINSKOFF: No, I called them
5  and, and asked them because you may not be aware
6  of this, but when Minskoff Grant first started, I
7  was the one that proposed that they, they use the
8  Yardi system and I installed and set that up in
9  their office. So I'm familiar with the program.
10  MICHAEL BREEDE: Okay. So no one's met
11  with these, these people?
12  ROBB ALEY ALLAN: I've met with them.
13  ROYANNE MINSKOFF: Oh, we've met with
14  them, yeah.
15  ROBB ALEY ALLAN: I met with them in
16  New York. That's how we got the proposal. I
17  mean, it doesn't come over the transom, I
18  solicited it. So that's the rationale. Uh, and
19  what I can tell you personally – this goes beyond
20  the content of the document that you've received
21  – is that Mark Massey, who's the principal of the
22  firm, has been, uh, an operator in New York real
23  estate for what is it, 17, 18 years, and worked
24  in Massey Nackel with his brother, Paul. I don't
25  know if know Paul or if you know Massey Nackel,

**Page 10**

1  but they have a first-rate reputation for small
2  property, uh –
3      MICHAEL BREEDE: Yeah, I am aware of
4  them. But, you know, I looked at his résumé and
5  I have several comments about the document. Uh,
6  one of them here pertains to this point, which is
7  that Massey's experiences as a sales broker.
8      ROBB ALEY ALLAN: Well, up until the
9  time he started Armstrong, that may be true.
10     MICHAEL BREEDE: But that was only four
11 years ago and they have four employees and they
12 only manage 100,000 square feet of commercial
13 space. And, you know, I have a project right now
14 for 60,000 that I have myself.
15     ROBB ALEY ALLAN: No, no, I think
16 you've misread it. In the first place, he was
17 doing management duties while he was at Massey
18 Nackel beyond leasing. But he was primarily a
19 leasing broker while he was there. Uh, the
20 properties that he has, apparently they're
21 managing 25 properties with about 500 units that
22 have 100,000 feet of commercial space. But the
23 properties are mixed use and include residential
24 as well, so –
25     MICHAEL BREEDE: Oh, but that, to me

TSG Reporting - Worldwide    877-702-9580

**Page 11**

1  that doesn't matter, you know, residential is not
2  commercial and he's got only 100,000 square feet
3  of commercial. Doesn't seem like a whole lot.
4      ROBB ALEY ALLAN: I don't know, how
5  much are these properties? I don't think 77th is
6  100,000.
7      SARA MINSKOFF ALLAN: How much is –
8      ROBB ALEY ALLAN: I don't think the
9  total of all our properties is 100,000. So I'm
10 not sure that that's particularly pertinent. I
11 think the qualifications are does he do a good
12 job, does he have good references, are we
13 satisfied with the facilities that he would bring
14 to the table. And what's his reputation.
15     MICHAEL BREEDE: Well, you know, again,
16 I, I see four people here at the firm. The other
17 guy, Fauntleroy, is a sales rep and a financial
18 analyst. He only started in management this
19 year. And in the, uh, page 7, the office manager
20 appears to have experience but the rent collector
21 joined the firm seven months ago and has
22 experience in the hospitality industry. You
23 know, my point is, and I have several more to
24 make, but my point is this is one firm. Why
25 aren't there others that have been solicited.

TSG Reporting - Worldwide    877-702-9580

**Page 12**

1      ROBB ALEY ALLAN: Others were
2  solicited. One of the problems that you run
3  into, Michael, as you can well imagine, is that
4  when you're talking about small properties that
5  have a half a dozen or a dozen storefronts, it's
6  hard to find managers that have experience at
7  that level and it's hard to – I don't want to say
8  experience at that level, it's hard to find
9  managers willing to undertake smaller portfolios
10 of properties with small retail spaces. The
11 large management firms are not interested. And
12 even if they were interested, I don't think any
13 of us would want to find ourselves lost in some
14 backroom at some major management firm.
15     MICHAEL BREEDE: Well, well, I agree
16 with you there. And another point I was going to
17 make was re, was with respect to the brokerage
18 firm that was recommended under this management
19 agreement. Futerman is a huge firm and I don't
20 think we would get attention there. But in any
21 case –
22     ROBB ALEY ALLAN: Well, I don't think –
23 we're not discussing leasing at this point, other
24 than to make the –
25     [OVERLAPPING VOICES]

TSG Reporting - Worldwide    877-702-9580

**Page 13**

1      MICHAEL BREEDE: What are all those
2  recommendations then at the end, at the end of
3  the report, at the end of the proposal?
4      ROBB ALEY ALLAN: I agree. But let me
5  make an observation about that. In the first
6  place, I think one of the advantages here is
7  precisely the fact that Armstrong is not
8  purporting to rep, to both provide management and
9  leasing services. They're purporting only to
10 provide management services and we as owners will
11 have the ability to choose any leasing agent that
12 we choose. They may make recommendations, but
13 we're not bound by those recommendations. And
14 that I think is a great advantage, it allows us
15 to pick the best people for each of the functions
16 we want to have performed.
17     Now, I, I don't entirely disagree with
18 you about Futerman. On the other hand, I notice
19 that Minskoff Grant has recently been using
20 Colliers, which is a pretty big firm. So
21 sometimes big firms can do better for you than
22 small firms. But that's a discussion to have
23 separately, it's not really pertinent to the
24 discussion of Armstrong.
25     MICHAEL BREEDE: Oh, um, it says here,

TSG Reporting - Worldwide    877-702-9580

**Page 14**

1  um, they refer on page 11 to the New Rochelle
2  property. What, what is that property?
3      ROBB ALEY ALLAN: I'm looking for the
4  reference –
5      MICHAEL BREEDE: It says our
6  preliminary plan for the White Plains-New
7  Rochelle, you know, it's listed twice under
8  additional resources. And, and this is a Queens
9  property. Well, they're talking about White
10  Plains and New Rochelle. I don't understand
11  that.
12      ROBB ALEY ALLAN: Well, I think that
13  that's just an artifact of the, uh, the fact that
14  I asked them to give us proposals on multiple
15  properties. So they've obviously written some
16  narrative that addresses all of them. But this
17  proposal is for this property.
18      MICHAEL BREEDE: Yeah, but it doesn't
19  even refer to Queens. But in any case, um –
20      ROBB ALEY ALLAN: It doesn't matter,
21  the point is that the, whether the narrative, you
22  know, parenthetically refers to somewhere else
23  really doesn't pertain to the, what they're
24  offering here.
25      MICHAEL BREEDE: [NO/NOW?] in their,

TSG Reporting - Worldwide        877-702-9580

**Page 15**

1  um, let's see, page 16 – the recommendations I
2  wasn't very impressed with. Um, at the end of
3  the paragraph, it just says we would also. Does
4  anyone have any further language on that?
5      ROYANNE MINSKOFF: Yeah, I, I called
6  him to, to ask him to, I called Mark Massey this
7  morning and asked him if he knew that that had
8  been, that sentence had been truncated and he
9  said that the sentence should read, We would also
10  implement cost control measures to limit expenses
11  while maintaining or enhancing services to
12  existing tenants.
13      MICHAEL BREEDE: Well, I just think
14  that's pretty sloppy.
15      ROBB ALEY ALLAN: Well, there's a typo
16  in one of the other properties as well. I mean,
17  these are, they –
18      MICHAEL BREEDE: Well, the ground
19  lease, it says it expires in 2026, which isn't
20  correct either. Um, and how would they, you
21  know, I know it's just a proposal, but how would
22  they lease these vacancies immediately?
23      ROBB ALEY ALLAN: Well, first of all,
24  they're not the leasing agent, so I can't tell
25  you. The second thing is in terms of having

TSG Reporting - Worldwide        877-702-9580

**Page 16**

1  accurate documentation for these properties,
2  remember, they have no documents on these
3  properties. They are only privy to what we have
4  told them at this point. So they have no access
5  to any of the ground leases or any other
6  documents that's not in their possession. So if
7  they've made an error, that's probably coming
8  from me.
9      MICHAEL BREEDE: Well, and you know, so
10  all these, these services, these outside services
11  on page 17, so, so you're saying I should just
12  ignore those?
13      ROYANNE MINSKOFF: I, I don't think we
14  should ignore them. I think the point here is
15  that, um, one of the benefits of hiring Armstrong
16  is it gives us ability to hire our own field
17  workforce as well as, as well as hiring our own
18  leasing broker outside of the management firm.
19      MICHAEL BREEDE: Well, for example, it
20  doesn't make a whole lot of sense to have a
21  maintenance person in Ozone Park for a property
22  in Queens.
23      ROBB ALEY ALLAN: I think that that's
24  the kind of thing that we can discuss. But
25  you've got to remember right now that we pay for

TSG Reporting - Worldwide        877-702-9580

**Page 17**

1  employees for these properties above and beyond
2  the management services that are provided and the
3  management fees that are charged. Uh, we have
4  the option here to be able to engage an outside
5  firm to provide field personnel or we could
6  perhaps direct Armstrong to hire personnel on our
7  behalf. I think that's a choice. I think it's
8  something we can discuss. I don't think it's a
9  disadvantage, I think if anything, it's an
10  advantage. We finally will have the opportunity
11  to fine-tune how these properties operate and
12  what the team is that's operating.
13      I'm particularly excited at the idea
14  that they don't purport to offer leasing
15  services, because that allows us to go pick the
16  best leasing agent and if we find that they're
17  not performing a satisfactory service, we can
18  dispose of them and get someone else. We don't
19  even have that option now.
20      MICHAEL BREEDE: Why not?
21      ROBB ALEY ALLAN: Because the leasing
22  is done by the same company that does the
23  management.
24      MICHAEL BREEDE: Well, we've got a
25  management agreement. We don't have a leasing

TSG Reporting - Worldwide        877-702-9580

25

## Page 18

1  agreement.
2        ROBB ALEY ALLAN: It's part and parcel
3  of the same company and actually, I've been
4  disturbed to know that the current management
5  company's leasing division has been sub – what's
6  the word I want to use?
7        SARA MINSKOFF ALLAN: Subcontracting?
8        ROBB ALEY ALLAN: Subcontracting our
9  leasing services to an outside firm that none of
10  us have had an opportunity to talk to, so – in
11  any case, I'm, I'm, this isn't, this isn't a
12  commentary about Minskoff Grant or its services.
13  This is a, a proposal received from Armstrong
14  that I think gives us greater flexibility and a
15  greater opportunity to fine-tune how we run these
16  properties at a cheaper cost.
17        MICHAEL BREEDE: Well, I, I guess I
18  have two final points, um, the first being, um,
19  you know, I think it would be a good idea to get
20  more than one company, uh, one proposal. Um,
21  I've only had, well, I've had less than 24 hours
22  – I got, I got the document about 6, 7 o'clock
23  yesterday – to even look at it. Um, secondly, I
24  don't know when you're proposing making a
25  decision to, uh, replace current management.

TSG Reporting - Worldwide      877-702-9580

## Page 19

1  But, you know, as you're aware, under the current
2  management agreement, which was approved by a
3  majority of the partners, was executed in April
4  of 2000, um, requires notice by July 3rd for
5  termination October 1st on an annual basis.
6        ROBB ALEY ALLAN: I wouldn't know that
7  because I don't have a copy of the management
8  agreement and have never been given one. So I
9  couldn't tell you what the current management
10  agreement says. And Royanne, I don't believe you
11  have a copy of it either, do you?
12        ROYANNE MINSKOFF: I don't, I don't
13  have one either.
14        ROBB ALEY ALLAN: So we're operating on
15  the basis of a partnership that doesn't even know
16  what its own agreement is.
17        MICHAEL BREEDE: Well, you know, I, I'm
18  certainly, you know, I've got a copy of it, I
19  think I might have it online even. But I can
20  certainly fax it over to you. But, um, it was
21  executed by Marjorie, Trish, US Trust and Jean
22  on, on April 1st, 2000. And it's, uh,
23  termination at this point is annually. Notice
24  has to be given by – and I counted some dates
25  here – but July 3rd for termination October 1st

TSG Reporting - Worldwide      877-702-9580

## Page 20

1  of each year.
2        ROBB ALEY ALLAN: Do you have any idea
3  whether that, whether that signature constitutes
4  a majority?
5        MICHAEL BREEDE: Yes.
6        ROBB ALEY ALLAN: Because we know that
7  on some of the partnership agreements –
8        MICHAEL BREEDE: On 77 Queens, yes, it
9  does. Uh, it was done before some estate
10  planning was completed, you know, on behalf of
11  Marjorie's family. But yes, it does. It also
12  applies to successors.
13        SARA MINSKOFF ALLAN: Is she a partner?
14        ROYANNE MINSKOFF: So you're saying –
15  well, let, let me, let me just reflect that the
16  time is 1:51. Um, I would still like to see us
17  come to some conclusion of a decision about
18  Armstrong and related decisions and then we would
19  look to legal to deal with any issues in terms
20  of, in terms of the existing agreement.
21        MICHAEL BREEDE: Well, I don't, I, I, I
22  understand your point. But I don't think it
23  would be wise to make a decision, um, that – for
24  example, to agree to, to sign on a management
25  company when we have one in place that we may not

TSG Reporting - Worldwide      877-702-9580

## Page 21

1  be able to terminate until next, until, uh,
2  October 1st of 2008. I think we should table
3  this. I'm happy to distribute the document. And
4  we can revisit it at a subsequent meeting.
5        ROBB ALEY ALLAN: ... want to second
6  that motion to table?
7        MICHAEL BREEDE: Excuse me? Oh no, I'm
8  just, it's a suggestion at this point.
9        ROBB ALEY ALLAN: I hear you.
10        MICHAEL BREEDE: But I think that's the
11  most prudent thing to do here.
12        ROBB ALEY ALLAN: Well, all right. So
13  I'm going to call for a vote. Who wants to table
14  this? Michael, I'm going to assume you're voting
15  in affirmative, even though you're not saying
16  anything.
17        MICHAEL BREEDE: I, I would like to
18  table this and, you know, I, I, I would strongly
19  suggest that it does get tabled because you don't
20  to enter into an agreement. And obviously saying
21  you're going to hire someone and signing them up
22  are two different things. But I would not
23  counsel to, to entering into an agreement with
24  one company when we already have a management
25  company. It's not, not, not a prudent thing to

TSG Reporting - Worldwide      877-702-9580

**Page 22**

1  do.
2      ROBB ALEY ALLAN: Well, I don't think
3  that's what the motion necessarily would actually
4  say. So let me –
5      MICHAEL BREEDE: If you want to, if you
6  want to, if, if, if you'd like to express the
7  motion, that's fine.
8      ROBB ALEY ALLAN: To make a motion in
9  the alternative. Uh, and what I'd like to move
10  is that we would hire Armstrong Realty Management
11  effective January 1st of 2008 and that we would
12  instruct Minskoff Grant to turn over to Armstrong
13  all of the partnership assets, records, monies,
14  keys, all partnership documents in their
15  possession, by the end of the year, December
16  31st, 2007. I'd like to add to that that we
17  instruct Minskoff Grant to cease all leasing
18  activity effective immediately.
19      MICHAEL BREEDE: So, so, so you want to
20  have two management companies for 10 months.
21      ROBB ALEY ALLAN: No, I'm not saying
22  that. And until I know for a fact that that's
23  what the management agreement says, I'm not
24  expressing an opinion as to whether it'll be for
25  10 months or one month. I don't know what the

**Page 23**

1  management agreement says, don't have a copy of
2  it, can't see what provisions it provides for us
3  to terminate management. So until I see that, I
4  can't make a comment.
5      MICHAEL BREEDE: Okay, and I think
6  legally it would be prudent to take a look at the
7  agreement before you agree to sign on any
8  additional management.
9      ROBB ALEY ALLAN: We're not signing
10  anything today, Michael.
11      MICHAEL BREEDE: But [UNINTEL] you just
12  said that you would hire them effective January
13  1st of '08.
14      ROBB ALEY ALLAN: We're authorizing
15  that action. Obviously, a management agreement
16  needs to be, needs to be circulated to the
17  members for approval prior to any signature. So,
18  you know, we have some time between here and
19  then.
20      MICHAEL BREEDE: And well, since
21  there's time, again, I think it would be prudent
22  to look at the document and then revisit this
23  issue. You've got six weeks.
24      ROBB ALEY ALLAN: Why six?
25      MICHAEL BREEDE: You know, four, five,

**Page 24**

1  six weeks. I don't know understand why it's so
2  pressing to do right now.
3      ROBB ALEY ALLAN: We're trying to, I
4  think –
5      ROYANNE MINSKOFF: So you, there's no
6  notification requirements.
7      ROBB ALEY ALLAN: No. If there's no –
8  I don't know what the notification requirements
9  are. I don't know what the termination
10  requirements are. What I know is that the end of
11  the year is coming up.
12      MICHAEL BREEDE: Well, I can say to you
13  that the notification is that it has to be, the
14  notification has to be given by July 3rd for
15  termination October 1st on an annual basis.
16      ROBB ALEY ALLAN: Well, I'm certain
17  that there's some, somewhat more language than
18  that with regard to termination. So let me
19  review it and I think we should all review it –
20      ROYANNE MINSKOFF: Is that for cause,
21  Michael, or is that for, is that just because –
22      MICHAEL BREEDE: There is also a for-
23  cause provision, which I don't know verbatim.
24  But I don't think you really want to get into
25  that legal issue.

**Page 25**

1      ROYANNE MINSKOFF: I didn't say that, I
2  was just asking a question.
3      MICHAEL BREEDE: There is a for-cause –
4      ROYANNE MINSKOFF: Since you're at the
5  advantage that you have the, you have the
6  document and the rest of us don't, that I don't
7  see, I don't see any reason why we can't move
8  forward with the decision today until we find
9  something to the contrary and then, and then if
10  that's what we have to live by, then there isn't
11  any damage done here, either.
12      MICHAEL BREEDE: Well, no, there's no
13  damage done until a document gets executed with
14  any subsequent management company. I would
15  definitely agree to that.
16      ROBB ALEY ALLAN: My point exactly.
17  All we're doing today is authorizing moving
18  forward with retaining Armstrong as our manager
19  and if we find that there's an obstacle to the
20  process, then obviously we'll have another
21  meeting and we'll decide what to do.
22      ROYANNE MINSKOFF: What I would
23  suggest, Michael, is, is while it would be
24  beneficial for all of us to have copies of the
25  existing management agreement, it would be more

**Page 26**

1  important as this stage for David Olisoff to have
2  a copy of it so he could advise us.
3      MICHAEL BREEDE: Okay. Well, what time
4  is it – I should know that, shouldn't I – it's
5  about 4. Um, I have to see if – I'm not sure I
6  have it online. So we'll see how that works, but
7  I will distribute it to – if everyone could give
8  me, um, an e-mail address they'd like it sent to,
9  I can arrange for that. I can figure out
10  Olisoff's. Is it just the typical ones that I
11  send to and who wants to receive it? Just one to
12  you, Robb, and one to you, Royanne? Would that
13  be sufficient?
14      ROYANNE MINSKOFF: That would be great,
15  Michael.
16      ROBB ALEY ALLAN: Well, if you send it
17  to properties@helical.com, Sara and I will both
18  get it.
19      MICHAEL BREEDE: So it's what –
20  properties – I think I have yours wrong. But
21  okay, so properties@helical.com?
22      ROBB ALEY ALLAN: Right.
23      MICHAEL BREEDE: Now, I just want to –
24  before you make this decision, I just want to
25  point out again that, you know, if you look at

TSG Reporting - Worldwide     877-702-9580

**Page 27**

1  the for-cause, you know, as, as, as a former
2  lawyer, you know, I, I, I would, you're going to
3  litigate that forever. You might as well just
4  wait until next October. You know, that, that's
5  my opinion. You can do with it what you will.
6      ROYANNE MINSKOFF: I wasn't, I wasn't
7  asking, I wasn't asking the question, Michael,
8  because I was suggesting that that was a course
9  of action. I was just asking if it was in the
10  document.
11      MICHAEL BREEDE: Yeah. It's, it's,
12  it's all very clear in the document. But the
13  provision I was referring to is like four lines,
14  it's very succinct. But in any case, I'll send
15  the things on to you. If not today, I'll do it
16  on Monday or some time over the weekend.
17      ROYANNE MINSKOFF: That's great.
18      MICHAEL BREEDE: And I'll send that one
19  and, getting ahead of myself, any other
20  properties. Uh, I mean, I only have the two. I
21  have that one and the one for 82nd-83rd.
22      ROBB ALEY ALLAN: You have an advantage
23  on us.
24      ROYANNE MINSKOFF: Yeah.
25      MICHAEL BREEDE: You know, I wish, I do

TSG Reporting - Worldwide     877-702-9580

**Page 28**

1  wish that, you know, I didn't know you didn't
2  have them. I do wish that it was, you know, made
3  public that you didn't have them.
4      ROBB ALEY ALLAN: I think I wrote you
5  an e-mail to that effect two or three months ago.
6      MICHAEL BREEDE: Oh, I don't remember
7  seeing that. But in any case, um, there's a
8  document, I'll send it and, uh, we're good to go.
9  Now, I don't know if you want to formalize any of
10  this, but I'll be quiet now.
11      ROBB ALEY ALLAN: All right. We have
12  two minutes left in this meeting, so there is a
13  motion on the table. I wanted to find out if
14  anybody would be willing to second that motion.
15  Do you want me to re-read it, what do you want me
16  to do.
17      SARA MINSKOFF ALLAN: I'll second it.
18      ROBB ALEY ALLAN: Well, actually, I'm
19  not an owner. I'm your proxy. So you can't
20  second your own motion.
21      ROYANNE MINSKOFF: It was my motion.
22      ROBB ALEY ALLAN: It was your motion?
23  I thought I was the one who –
24      MICHAEL BREEDE: I thought it was
25  Robb's motion [LAUGHS].

TSG Reporting - Worldwide     877-702-9580

**Page 29**

1      ROYANNE MINSKOFF: Oh, I'm sorry. I'll
2  second it.
3      ROBB ALEY ALLAN: All right. So in any
4  case, just, I mean, we're just beating the
5  formalities to death here.
6      ROYANNE MINSKOFF: All right, seconded.
7      ROBB ALEY ALLAN: Well, I think we have
8  a motion and it's seconded. Why don't we go
9  ahead on vote on this so that at least we have a
10  record of the, uh, disposition of it. So all in
11  favor of the motion?
12      ROYANNE MINSKOFF: Aye.
13      ROBB ALEY ALLAN: All against.
14      MICHAEL BREEDE: Aye.
15      ROBB ALEY ALLAN: All right. So that's
16  two to one and I think that's a majority, so the
17  motion carries. Uh, I will at that point just
18  make the observation that obviously we want to
19  review the current management agreement and see
20  what provisions it has that might affect this.
21  So as soon as we get that, the better. I hate to
22  do this, but we are up against the next meeting –
23      ROYANNE MINSKOFF: I'll move to
24  adjourn.
25      ROBB ALEY ALLAN: - where another

TSG Reporting - Worldwide     877-702-9580

Page 30

1  partner may call in, so I think what we should
2  probably do is adjourn this meeting. So I'll
3  entertain a motion to do that.
4          ROYANNE MINSKOFF: Move to adjourn.
5          MICHAEL BREEDE: Seconded.
6          ROBB ALEY ALLAN: Any objection? All
7  right, without objection, we're adjourning and
8  what I'm going to do is stop recording of this
9  call now and then I will start it again for the
10  next meeting. Hold on.
11          [END OF TAPE]
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 31

1  A Plus Recording and Transcribing, a division of
2  A Plus Office Support Systems, states that the
3  preceding transcript was created by one of its
4  employees using standard electronic transcription
5  equipment and is a true and accurate record of
6  the audio on the provided media to the best of
7  that employee's ability. The media from which we
8  worked was provided to us. We can make no
9  statement as to its authenticity.
10
11          Attested to by:
12
13
14          Patrick Weaver
15
16
17
18
19
20
21
22
23
24
25

---

**A**

**ability (3)**
13:11 16:16 31:7
**able (2)**
17:4 21:1
**access (2)**
5:22 16:4
**accurate (2)**
16:1 31:5
**action (2)**
23:15 27:9
**activity (1)**
22:18
**add (2)**
22:16
**addenda (1)**
7:18
**additional (3)**
7:18 14:8 23:8
**address (1)**
26:8
**addresses (1)**
14:16
**adjourn (3)**
29:24 30:2,4
**adjourning (1)**
30:7
**advantage (4)**
13:14 17:10 25:5
27:22
**advantages (1)**
13:6
**advise (1)**
26:2
**affect (1)**
29:20
**affirmative (1)**
21:15
**aged (1)**
8:10
**agenda (4)**
2:10 3:5 4:12 6:13
**agent (3)**
13:11 15:24 17:16
**ago (3)**
10:11 11:21 28:5
**agree (5)**
12:15 13:4 20:24 23:7
25:15
**agreed (1)**
3:25

**agreement (17)**
7:10 12:19 17:25 18:1
19:2,8,10,16 20:20
21:20,23 22:23 23:1
23:7,15 25:25 29:19
**agreements (1)**
20:7
**ahead (2)**
27:19 29:9
**ALEY (72)**
2:4,17,21,25 3:4 4:8
4:13,17,25 5:5,9,13
5:19,24 6:3,10,12
7:5,13,22 8:5,20,24
9:3,12,15 10:8,15
11:4,8 12:1,22 13:4
14:3,12,20 15:15,23
16:23 17:21 18:2,8
19:6,14 20:2,6 21:15
21:9,12 22:2,8,21
23:9,14,24 24:3,7
24:16 25:16 26:16
26:22 27:22 28:4,11
28:18,22 29:3,7,13
29:15,25 30:6
**Allan (79)**
2:4,17,21,23,24,25
3:4 4:8,13,17,25 5:5
5:9,13,19,24 6:3,10
6:11,12 7:5,13,22
8:5,20,24 9:3,12,15
10:8,15 11:4,7,8
12:1,22 13:4 14:3
14:12,20 15:15,23
16:23 17:21 18:2,7
18:8 19:6,14 20:2,6
20:13 21:5,9,12
22:2,8,21 23:9,14
23:24 24:3,7,16
25:16 26:16,22
27:22 28:4,11,17,18
28:22 29:3,7,13,15
29:25 30:6
**allows (2)**
13:14 17:15
**alternative (2)**
3:13 22:9
**analyst (1)**
11:18
**annual (2)**
19:5 24:15

**annually (1)**
19:23
**answer (1)**
7:5
**anybody (1)**
28:14
**apparently (1)**
10:20
**appears (1)**
11:20
**applies (1)**
20:12
**approval (1)**
23:17
**approved (2)**
3:11 19:2
**April (2)**
19:3,22
**aren't (1)**
11:25
**Armstrong (11)**
6:15 10:9 13:7,24
16:15 17:6 18:13
20:18 22:10,12
25:18
**arrange (1)**
26:9
**arrearages (1)**
8:12
**artifact (1)**
14:13
**asked (3)**
9:5 14:14 15:7
**asking (4)**
25:2 27:7,7,9
**assets (1)**
22:13
**Associates (1)**
2:6
**assume (1)**
21:14
**attention (1)**
12:20
**Attested (1)**
31:11
**audio (4)**
4:23,25 5:14 31:6
**authenticity (1)**
31:9
**authorizing (2)**
23:14 25:17

**available (2)**
4:24 6:6
**aware (2)**
9:5 10:3 19:1
**Aye (2)**
29:12,14

**B**

**backroom (1)**
12:14
**bank (3)**
7:15 8:10,11
**basis (3)**
19:5,15 24:15
**beating (1)**
29:4
**BEEP (1)**
2:1
**behalf (7)**
2:14,17,18,22,25 17:7
20:10
**believe (4)**
3:14 6:24 8:20 19:10
**Bello (2)**
3:14,16
**beneficial (1)**
25:24
**benefits (1)**
16:15
**best (3)**
13:15 17:16 31:6
**better (2)**
13:21 29:21
**beyond (3)**
9:19 10:18 17:1
**big (2)**
13:20,21
**bit (4)**
3:6,6 7:18 8:7
**bound (1)**
13:13
**boxes (2)**
6:19 7:7
**Breede (65)**
2:2,20 3:2,2 4:4,5,9
4:15,22 5:3,7,11,17
5:23 6:1,7 7:1,9,21
9:1,10 10:3,10,25
11:15 12:15 13:1,25
14:5,18,25 15:13,18
16:9,19 17:20,24

18:17 19:17 20:5,8
20:21 21:7,10,17
22:5,19 23:5,11,20
23:25 24:12,22 25:3
25:12 26:3,19,23
27:11,18,25 28:6,24
29:14 30:5
**bring (1)**
11:13
**bringing (1)**
4:21
**broker (3)**
10:7,19 16:18
**brokerage (1)**
12:17
**brother (1)**
9:24
**brought (1)**
4:11

**C**

**call (3)**
21:13 30:1,9
**called (4)**
6:14 9:4 15:5,6
**calling (1)**
2:13
**candidate (1)**
3:17
**carries (1)**
29:17
**case (6)**
12:21 14:19 18:11
27:14 28:7 29:4
**cash (1)**
8:8
**cause (2)**
24:20,23
**caused (1)**
3:17
**cease (1)**
22:17
**certain (1)**
24:16
**certainly (2)**
19:18,20
**change (2)**
1:13 3:11
**charged (1)**
17:3
**cheaper (1)**

18:16
**checklist (1)**
7:11
**checklists (1)**
7:17
**choice (1)**
17:7
**choose (2)**
13:11,12
**circulated (2)**
6:23 23:16
**clear (1)**
27:12
**Coast (1)**
2:7
**code (1)**
5:22
**collector (1)**
11:20
**Colliers (1)**
13:20
**come (2)**
9:17 20:17
**coming (2)**
16:7 24:11
**comment (1)**
23:4
**commentary (1)**
18:12
**comments (1)**
10:5
**commercial (4)**
10:12,22 11:2,3
**companies (2)**
22:20 23:8
**company (7)**
17:22 18:3,20 20:25
21:24,25 25:14
**company's (1)**
18:5
**completed (1)**
20:10
**conclusion (1)**
20:17
**confidence (1)**
3:20
**constitutes (1)**
20:3
**contain (1)**
7:3
**content (1)**

9:20
**contents (1)**
7:24
**contract (1)**
7:16
**contrary (1)**
25:9
**control (1)**
15:10
**copies (4)**
6:23 7:3 8:11 25:24
**copy (5)**
19:7,11,18 23:1 26:2
**correct (4)**
4:5,6 7:21 15:20
**cost (2)**
15:10 18:16
**counsel (1)**
21:23
**counted (1)**
19:24
**course (1)**
27:8
**created (1)**
31:3
**current (6)**
2:11 18:4,25 19:1,9
29:19
**currently (2)**
3:23 8:4
**customize (2)**
8:18,25

_____
   **D**
**damage (2)**
25:11,13
**dates (1)**
19:24
**David (3)**
3:22,24 26:1
**days (3)**
5:5,9 6:6
**deal (1)**
20:19
**death (1)**
29:5
**December (1)**
22:15
**decide (1)**
25:21
**decision (5)**

18:25 20:17,23 25:8
26:24
**decisions (1)**
20:18
**definitely (1)**
25:15
**Del (2)**
3:14,16
**designated (1)**
3:12
**different (1)**
21:22
**direct (1)**
17:6
**disadvantage (1)**
17:9
**disagree (1)**
13:17
**discuss (4)**
2:11 3:9 16:24 17:8
**discussing (1)**
12:23
**discussion (3)**
3:13 13:22,24
**dispose (1)**
17:18
**disposition (1)**
29:10
**distribute (2)**
21:3 26:7
**disturbed (1)**
18:4
**division (2)**
18:5 31:1
**document (10)**
9:20 10:5 18:22 21:3
23:22 25:6,13 27:10
27:12 28:8
**documentation (1)**
16:1
**documents (3)**
16:2,6 22:14
**doing (2)**
10:17 25:17
**dozen (2)**
12:5,5
**duties (1)**
10:17

_____
   **E**
**e (1)**

2:8
**East (1)**
2:7
**effect (1)**
28:5
**effective (3)**
22:11,18 23:12
**either (4)**
15:20 19:11,13 25:11
**electronic (4)**
6:16,22 7:25 31:4
**employees (3)**
10:11 17:1 31:4
**employee's (1)**
31:7
**engage (2)**
3:25 17:4
**enhancing (1)**
15:11
**enter (1)**
21:20
**entering (1)**
21:23
**entertain (1)**
30:3
**entirely (1)**
13:17
**equipment (1)**
31:5
**Equities (1)**
2:14
**error (1)**
16:7
**estate (2)**
9:23 20:9
**event (1)**
3:16
**everybody (4)**
3:18,23 6:4 7:20
**everybody's (1)**
3:20
**exactly (2)**
8:19 25:16
**example (2)**
16:19 20:24
**excited (1)**
17:13
**excuse (2)**
2:18 21:7
**executed (3)**
19:3,21 25:13

**exhibits (1)**
7:3
**existing (3)**
15:12 20:20 25:25
**expansive (1)**
8:7
**expense (1)**
8:9
**expenses (1)**
15:10
**experience (4)**
11:20,22 12:6,8
**experiences (1)**
10:7
**expires (1)**
15:19
**express (2)**
6:21 22:6
**Expresses (1)**
6:19
**expressing (1)**
22:24
**e-mail (2)**
6:3 26:8 28:5
**e-mailed (1)**
3:18

_____
   **F**
**facilities (1)**
11:13
**fact (3)**
13:7 14:13 22:22
**fair (1)**
6:7
**familiar (1)**
9:9
**family (1)**
20:11
**fashion (1)**
7:24
**Fauntleroy (1)**
11:17
**favor (1)**
29:11
**fax (1)**
19:20
**February (3)**
3:8 5:20,25
**Federal (2)**
6:19,21
**fees (1)**

17:3
**feet (3)**
10:12,22 11:2
**field (2)**
16:16 17:5
**figure (1)**
26:9
**final (1)**
18:18
**finally (1)**
17:10
**financial (1)**
11:17
**find (7)**
12:6,8,13 17:16 25:8
25:19 28:13
**fine (1)**
22:7
**fine-tune (2)**
17:11 18:15
**firm (15)**
3:14,15 6:14 9:2,22
11:16,21,24 12:14
12:18,19 13:20
16:18 17:5 18:9
**firms (3)**
12:11 13:21,22
**first (5)**
9:6 10:16 13:5 15:23
18:18
**first-rate (1)**
10:1
**five (1)**
23:25
**flexibility (1)**
18:14
**flows (1)**
8:8
**flyer (1)**
7:10
**forever (1)**
27:3
**form (1)**
6:16
**formalities (1)**
29:5
**formalize (1)**
28:9
**former (1)**
27:1
**forward (2)**

25:8,18
**for-cause (2)**
25:3 27:1
**four (5)**
10:10,11 11:16 23:25
27:13
**full (1)**
8:21
**functions (1)**
13:15
**further (3)**
4:2 6:8 15:4
**Futerman (2)**
12:19 13:18

**G**

**generate (1)**
8:14
**getting (1)**
27:19
**give (2)**
14:14 26:7
**given (4)**
9:2 19:8,24 24:14
**gives (2)**
16:16 18:14
**giving (1)**
4:19
**go (5)**
2:2 7:13 17:15 28:8
29:8
**goes (1)**
9:19
**going (8)**
2:4 4:18 12:16 21:13
21:14,21 27:2 30:8
**good (7)**
5:4,5,9 11:11,12
18:19 28:8
**Grant (6)**
2:19 9:6 13:19 18:12
22:12,17
**great (4)**
8:25 13:14 26:14
27:17
**greater (2)**
18:14,15
**ground (2)**
15:18 16:5
**guess (1)**
18:17

**guy (1)**
11:17

**H**

**half (1)**
12:5
**hand (1)**
13:18
**happy (1)**
21:3
**hard (3)**
12:6,7,8
**hate (1)**
29:21
**hear (1)**
21:9
**Heh-heh (1)**
5:18
**hire (6)**
5:1 16:16 17:6 21:21
22:10 23:12
**hiring (2)**
16:15,17
**Hold (2)**
7:13 30:10
**hospitality (1)**
11:22
**hours (1)**
18:21
**huge (1)**
12:19

**I**

**idea (3)**
17:13 18:19 20:2
**identical (1)**
8:3
**identity (1)**
6:5
**ignore (2)**
16:12,14
**imagine (1)**
12:3
**immediately (2)**
15:22 22:18
**implement (1)**
15:10
**important (1)**
26:1
**impressed (1)**
15:2

**include (1)**
10:23
**income (1)**
8:8
**indicted (1)**
3:19
**industry (1)**
11:22
**information (2)**
4:2 6:2
**installed (1)**
9:8
**instruct (2)**
22:12,17
**instructing (1)**
6:4
**interested (2)**
12:11,12
**interests (1)**
4:18
**interviewed (1)**
3:22
**issue (3)**
4:3 23:23 24:25
**issues (1)**
20:19
**item (1)**
6:13
**items (1)**
3:5
**it'll (1)**
22:24

**J**

**January (2)**
22:11 23:12
**Jean (3)**
2:18,19 19:21
**job (1)**
11:12
**joined (1)**
11:21
**July (3)**
19:4,25 24:14

**K**

**keys (1)**
22:14
**kind (1)**
16:24
**knew (1)**

15:7
**know (45)**
8:13 9:25,25,25 10:4
10:13 11:1,4,**15**,23
14:7,22 15:21,21
16:9 18:4,19,24
19:1,6,15,17,**18**
20:6,10 21:18 22:22
22:25 23:18,25 24:1
24:8,9,10,23 26:4
26:25 27:1,2,4,25
28:1,1,2,9
**knowing (1)**
4:18
**knows (1)**
3:23

**L**

**language (2)**
15:4 24:17
**large (1)**
12:11
**LAUGHS (2)**
2:3 28:25
**law (1)**
3:13
**lawyer (1)**
27:2
**learn (1)**
8:21
**lease (2)**
15:19,22
**leases (1)**
16:5
**leasing (14)**
10:18,19 12:23 13:9
13:11 15:24 16:18
17:14,16,21,25 18:5
18:9 22:17
**left (1)**
28:12
**legal (8)**
2:12 3:6,9,11 4:3,10
20:19 24:25
**legally (1)**
23:6
**let's (1)**
15:1
**level (2)**
12:7,8
**limit (1)**

15:10
Limited (1)
2:19
lines (1)
27:13
listed (1)
14:7
litigate (1)
27:3
little (3)
3:5,6 8:7
live (1)
25:10
LLC (2)
2:22 3:1
long (1)
5:3
look (6)
8:6 18:23 20:19 23:6
  23:22 26:25
looked (2)
7:6 10:4
looking (1)
14:3
lost (1)
12:13
lot (2)
11:3 16:20
LP (1)
2:14

_____ M _____
mailed (1)
2:9
maintaining (1)
15:11
maintenance (1)
16:21
major (1)
12:14
majority (3)
19:3 20:4 29:16
making (1)
18:24
manage (1)
10:12
management (35)
1:13 2:11,14 6:14,15
  7:12,16 10:17 11:18
  12:11,14,18 13:8,10
  16:18 17:2,3,23,25

18:4,25 19:2,7,9
20:24 21:24 22:10
22:20,23 23:1,3,15
25:14,25 29:19
manager (2)
11:19 25:18
managers (2)
12:6,9
managing (1)
10:21
Marjorie (1)
19:21
Marjorie's (1)
20:11
Mark (2)
9:21 15:6
Massey (5)
9:21,24,25 10:17 15:6
Massey's (1)
10:7
material (1)
7:19
matter (3)
4:20 11:1 14:20
mean (6)
5:1 9:3,17 15:16
27:20 29:4
meaningful (1)
7:24
measures (1)
15:10
media (2)
31:6,7
meeting (14)
1:13 2:6,8,10 3:8,16
  4:12,14 21:4 25:21
  28:12 29:22 30:2,10
meetings (1)
6:18
members (1)
23:17
memorializing (1)
4:16
met (4)
9:10,12,13,15
Michael (73)
2:2,20 3:2,2 4:4,5,9
  4:15,22 5:3,7,11,17
  5:23 6:1,7,24 7:1,9
  7:21 9:1,10 10:3,10
  10:25 11:15 12:3,15

13:1,25 14:5,18,25
15:13,18 16:9,19
17:20,24 18:17
19:17 20:5,8,21
21:7,10,14,17 22:5
22:19 23:5,10,11,20
23:25 24:12,21,22
25:3,12,23 26:3,15
26:19,23 27:7,11,18
27:25 28:6,24 29:14
30:5
Minskoff (39)
2:15,16,18,22,24 6:11
  8:2,15,23 9:4,6,13
  11:7 13:19 15:5
  16:13 18:7,12 19:12
  20:13,14 22:12,17
  24:5,20 25:1,4,22
  26:14 27:6,17,24
  28:17,21 29:1,6,12
  29:23 30:4
minutes (1)
28:12
misread (1)
10:16
MISSING (3)
2:21 3:8,19
misunderstood (1)
6:17
mixed (1)
10:23
Monday (1)
27:16
monies (1)
22:13
month (1)
22:25
months (4)
11:21 22:20,25 28:5
morning (2)
7:7 15:7
motion (14)
21:6 22:3,7,8 28:13
  28:14,20,21,22,25
  29:8,11,17 30:3
move (4)
22:9 25:7 29:23 30:4
moving (2)
6:12 25:17
multiple (1)
14:14

MYCA (1)
2:22

_____ N _____
Nackel (3)
9:24,25 10:18
narrative (2)
14:16,21
necessarily (1)
22:3
need (1)
4:3
needs (2)
23:16,16
never (1)
19:8
new (5)
7:17 9:16,22 14:1,10
nope (1)
2:25
notice (4)
2:8 13:18 19:4,23
notification (4)
24:6,8,13,14
November (2)
2:7,9
NO/NOW (1)
14:25

_____ O _____
objection (2)
30:6,7
observation (2)
13:5 29:18
obstacle (1)
25:19
obviously (6)
7:19 14:15 21:20
  23:15 25:20 29:18
occurred (1)
3:16
October (5)
19:5,25 21:2 24:15
  27:4
offer (1)
17:14
offering (1)
14:24
office (4)
7:7 9:9 11:19 31:2
oh (9)

4:15 5:14 6:1 9:13
  10:25 13:25 2 1:7
  28:6 29:1
okay (9)
4:22 5:3 6:2,7,12 9:10
  23:5 26:3,21
Olisoff (3)
3:23,24 26:1
Olisoff's (1)
26:10
ones (1)
5:19 8:3 26:10
one's (1)
9:10
online (2)
19:19 26:6
operate (1)
17:11
operating (2)
17:12 19:14
operator (1)
9:22
opinion (2)
22:24 27:5
opportunity (3)
17:10 18:10,15
opposed (1)
8:22
option (2)
17:4,19
order (1)
3:5
outside (4)
16:10,18 17:4 18:9
OVERLAPPING (2)
5:16 12:25
owner (1)
28:19
owners (1)
13:10
Ozone (1)
16:21
o'clock (1)
18:22

_____ P _____
page (8)
5:6,21,25 6:4 11:19
  14:1 15:1 16:11
paragraph (1)
15:3

parcel (1)
18:2
parenthetically (1)
14:22
Park (1)
16:21
part (2)
4:11 18:2
particularly (2)
11:10 17:13
partner (2)
20:13 30:1
partners (5)
2:9 3:10,19 4:18 19:3
partnership (12)
2:6,19 3:7,8,9,13 4:2
4:14 19:15 20:7
22:13,14
partnerships (1)
3:24
parts (1)
8:22
Patrick (1)
31:14
Paul (2)
9:24,25
PAUSE (1)
7:14
pay (1)
16:25
people (3)
9:11 11:16 13:15
performed (1)
13:16
performing (1)
17:17
person (2)
6:18 16:21
personally (1)
9:19
personnel (2)
17:5,6
pertain (2)
7:23 14:23
pertains (1)
10:6
pertinent (2)
11:10 13:23
pick (2)
13:15 17:15
place (3)

10:16 13:6 20:25
Plains (1)
14:10
Plains-New (1)
14:6
plan (1)
14:6
planning (1)
20:10
Plus (2)
31:1,2
point (14)
10:6 11:23,24 12:16
12:23 14:21 16:4,14
19:23 20:22 21:8
25:16 26:25 29:17
points (1)
18:18
portfolios (1)
12:9
possession (2)
16:6 22:15
posted (1)
5:6
preceding (1)
31:3
precisely (1)
13:7
preliminary (1)
14:6
present (5)
2:16,20,22,24 3:3
presentation (2)
8:16 9:2
pressing (1)
24:2
pretty (2)
13:20 15:14
primarily (1)
10:18
principal (1)
9:21
printed (1)
7:2
prior (1)
23:17
privy (1)
16:3
probably (2)
16:7 30:2
problems (1)

12:2
process (1)
25:20
produces (1)
8:17
program (1)
9:9
project (1)
10:13
properties (16)
10:20,21,23 11:5,9
12:4,10 14:15 15:16
16:1,3 17:1,11
18:16 26:20 27:20
properties@helical....
26:17,21
property (8)
4:19 7:17 10:2 14:2,2
14:9,17 16:21
proposal (7)
6:14 9:16 13:3 14:17
15:21 18:13,20
proposals (2)
6:20 14:14
proposed (2)
2:10 9:7
proposing (1)
18:24
provide (3)
13:8,10 17:5
provided (3)
17:2 31:6,8
provides (1)
23:2
provision (2)
24:23 27:13
provisions (2)
23:2 29:20
proxy (1)
28:19
prudent (4)
21:11,25 23:6,21
public (1)
28:3
purport (1)
17:14
purporting (2)
13:8,9
p.m (1)
2:7

**Q**

QCR (1)
3:1
qualifications (1)
11:11
Queens (5)
2:6 14:8,19 16:22
20:8
question (6)
4:6,9,23 6:9 25:2 27:7
quick (1)
4:22
quiet (1)
28:10
quite (1)
7:18

**R**

rationale (1)
9:18
read (1)
15:9
real (1)
9:22
really (4)
8:18 13:23 14:23
24:24
Realty (2)
6:15 22:10
reason (1)
25:7
recall (2)
3:10 8:6
receivables (1)
8:11
receive (2)
8:4 26:11
received (5)
6:14,16 7:1 9:20
18:13
recommendations (4)
13:2,12,13 15:1
recommended (2)
3:15 12:18
reconciliation (1)
8:10
record (2)
29:10 31:5
recorded (2)
5:20,20
recording (4)

4:23 6:5 30:8 31:1
recordings (1)
5:14
records (1)
22:13
redistribute (1)
6:21
Reed (4)
3:22 4:1,10 6:9
refer (2)
14:1,19
reference (1)
14:4
references (1)
11:12
referring (1)
27:13
refers (1)
14:22
reflect (1)
20:15
regard (1)
24:18
register (3)
8:9,9,9
related (1)
20:18
remember (3)
16:2,25 28:6
rent (1)
11:20
rep (2)
11:17 13:8
repeat (1)
2:5
replace (1)
18:25
report (5)
4:13,20 7:12 8:12
13:3
reporting (1)
8:18
reports (2)
7:16 8:3
represent (1)
3:12
representation (4)
3:9,11 4:7,10
represented (1)
3:24
representing (1)

4:1
**reputation (2)**
10:1 11:14
**request (1)**
8:17
**requirements (3)**
24:6,8,10
**requires (1)**
19:4
**residential (2)**
10:23 11:1
**resources (1)**
14:8
**respect (1)**
12:17
**rest (1)**
25:6
**retail (1)**
12:10
**retaining (1)**
25:18
**review (3)**
24:19,19 29:19
**revisit (2)**
21:4 23:22
**re-read (1)**
28:15
**right (14)**
2:4,17 8:24,25 10:13
16:25 21:12 24:2
26:22 28:11 29:3,6
29:15 30:7
**Robb (74)**
2:4,17,21,25 3:4 4:8
4:13,17,25 5:5,9,13
5:19,24 6:3,10,12
7:5,13,22 8:2,5,20
8:24 9:3,12,15 10:8
10:15 11:4,8 12:1
12:22 13:4 14:3,12
14:20 15:15,23
16:23 17:21 18:2,8
19:6,14 20:2,6 21:5
21:9,12 22:2,8,21
23:9,14,24 24:3,7
24:16 25:16 26:12
26:16,22 27:22 28:4
28:11,18,22 29:3,7
29:13,15,25 30:6
**Robb's (1)**
28:25

**Rochelle (3)**
14:1,7,10
**roll (1)**
2:13
**Royanne (30)**
2:16 3:12 6:10 8:2,15
8:20,23 9:4,13 15:5
16:13 19:10,12
20:14 24:5,20 25:1
25:4,22 26:12,14
27:6,17,24 28:21
29:1,6,12,23 30:4
**run (2)**
12:2 18:15
**résumé (1)**
10:4

_____
S
_____
**sales (2)**
10:7 11:17
**sample (7)**
7:10,11,11,11,15,15
7:16
**samples (1)**
7:4
**Sara (9)**
2:22,24 6:10,11 11:7
18:7 20:13 26:17
28:17
**satisfactory (1)**
17:17
**satisfied (1)**
11:13
**saw (1)**
8:15
**saying (5)**
16:11 20:14 21:15,20
22:21
**says (7)**
13:25 14:5 15:3,19
19:10 22:23 23:1
**second (6)**
15:25 21:5 28:14,17
28:20 29:2
**seconded (3)**
29:6,8 30:5
**secondly (1)**
18:23
**see (12)**
8:7,12 11:16 15:1
20:16 23:2,3 25:7,7

26:5,6 29:19
**seeing (1)**
28:7
**send (5)**
26:11,16 27:14,18
28:8
**sense (1)**
16:20
**sent (4)**
6:3,18 7:2 26:8
**sentence (2)**
15:8,9
**separately (1)**
13:23
**series (1)**
7:17
**service (1)**
17:17
**services (11)**
2:12 3:7 13:9,10
15:11 16:10,10 17:2
17:15 18:9,12
**set (1)**
9:8
**seven (1)**
11:21
**sign (2)**
20:24 23:7
**signature (2)**
20:3 23:17
**signing (2)**
21:21 23:9
**simply (1)**
4:20
**six (3)**
23:23,24 24:1
**sloppy (1)**
15:14
**small (4)**
10:1 12:4,10 13:22
**smaller (1)**
12:9
**solicited (3)**
9:18 11:25 12:2
**somebody (1)**
5:1
**somewhat (1)**
24:17
**soon (2)**
6:23 29:21
**sorry (3)**

4:8 5:7 29:1
**space (2)**
10:13,22
**spaces (1)**
12:10
**specific (1)**
6:5
**speed (1)**
4:21
**square (2)**
10:12 11:2
**stage (1)**
26:1
**standard (1)**
31:4
**start (2)**
2:13 30:9
**started (3)**
9:6 10:9 11:18
**statement (2)**
7:11 31:9
**statements (2)**
7:15 8:11
**states (1)**
31:2
**status (2)**
2:11 4:13
**stop (1)**
30:8
**storefronts (1)**
12:5
**strongly (1)**
21:18
**sub (1)**
18:5
**Subcontracting (2)**
18:7,8
**subsequent (3)**
3:15 21:4 25:14
**successors (1)**
20:12
**succinct (1)**
27:14
**sufficient (1)**
26:13
**suggest (2)**
21:19 25:23
**suggesting (1)**
27:8
**suggestion (1)**
21:8

**Support (1)**
31:2
**suppose (1)**
5:1
**sure (2)**
11:10 26:5
**system (2)**
8:22 9:8
**Systems (1)**
31:2

_____
T
_____
**table (6)**
11:14 21:2,6,13,18
28:13
**tabled (1)**
21:19
**take (2)**
3:4 23:6
**talk (2)**
3:6 18:10
**talking (2)**
12:4 14:9
**TAPE (1)**
30:11
**team (1)**
17:12
**tell (4)**
7:8 9:19 15:24 19:9
**tenants (1)**
15:12
**terminate (2)**
21:1 23:3
**termination (6)**
19:5,23,25 24:9,15,18
**terms (4)**
7:25 15:25 20:19,20
**they'd (1)**
26:8
**they've (5)**
8:8,8,10 14:15 16:7
**Thiel (4)**
3:22 4:1,10 6:9
**thing (4)**
15:25 16:24 21:11,25
**things (5)**
7:15,18 8:13 21:22
27:15
**think (42)**
3:18 4:4,17 6:8 7:22
8:5,6 10:15 11:5,8

| | | | | |
|---|---|---|---|---|
| 11:11 12:12,20,22<br>13:6,14 14:12 15:13<br>16:13,14,23 17:7,7<br>17:8,9 18:14,19<br>19:19 20:22 21:2,10<br>22:2 23:5,21 24:4<br>24:19,24 26:20 28:4<br>29:7,16 30:1<br>**thought (2)**<br>28:23,24<br>**three (3)**<br>6:19 7:7 28:5<br>**time (9)**<br>2:8 3:10,14 10:9<br>20:16 23:18,21 26:3<br>27:16<br>**today (4)**<br>23:10 25:8,17 27:15<br>**told (1)**<br>16:4<br>**total (1)**<br>11:9<br>**transaction (1)**<br>8:9<br>**transcribe (1)**<br>5:2<br>**Transcribing (1)**<br>31:1<br>**transcript (2)**<br>4:24 31:3<br>**transcription (1)**<br>31:4<br>**transom (1)**<br>9:17<br>**Trish (1)**<br>19:21<br>**true (2)**<br>10:9 31:5<br>**truncated (1)**<br>15:8<br>**Trust (1)**<br>19:21<br>**trying (1)**<br>24:3<br>**turn (1)**<br>22:12<br>**twice (1)**<br>14:7<br>**two (8)**<br>3:5 18:18 21:22 22:20<br>27:20 28:5,12 29:16 | **typical (1)**<br>26:10<br>**typo (1)**<br>15:15<br><br>**U**<br>**uh (34)**<br>2:5,8 3:2,4,4,16,17<br>4:23 5:11 6:13 7:3<br>7:16,23,23 8:11,16<br>9:18,22 10:2,5,19<br>11:19 14:13 17:3<br>18:20,25 19:22 20:9<br>21:1 22:9 27:20<br>28:8 29:10,17<br>**um (22)**<br>4:6,23 6:8 8:3 13:25<br>14:1,19 15:1,2,20<br>16:15 18:18,18,20<br>18:23 19:4,20 20:16<br>20:23 26:5,8 28:7<br>**undermined (1)**<br>3:19<br>**understand (3)**<br>14:10 20:22 24:1<br>**undertake (1)**<br>12:9<br>**Unfortunately (1)**<br>6:17<br>**UNINTEL (3)**<br>2:15 7:23 23:11<br>**units (1)**<br>10:21<br>**use (4)**<br>8:2 9:7 10:23 18:6<br>**useful (1)**<br>7:19<br><br>**V**<br>**vacancies (1)**<br>15:22<br>**variety (1)**<br>7:14<br>**verbatim (1)**<br>24:23<br>**version (1)**<br>7:25<br>**VOICES (2)**<br>5:16 12:25<br>**vote (2)**<br>21:13 29:9 | **voting (1)**<br>21:14<br><br>**W**<br>**wait (1)**<br>27:4<br>**walked (1)**<br>7:6<br>**want (16)**<br>8:19 12:7,13 13:16<br>18:6 21:5 22:5,6,19<br>24:24 26:23,24 28:9<br>28:15,15 29:18<br>**wanted (1)**<br>28:13<br>**wants (2)**<br>21:13 26:11<br>**wasn't (4)**<br>15:2 27:6,6,7<br>**way (2)**<br>5:21 7:23<br>**Weaver (1)**<br>31:14<br>**Web (4)**<br>5:6,21,24 6:4<br>**Website (3)**<br>5:10,12,13<br>**weekend (2)**<br>6:22 27:16<br>**weeks (2)**<br>23:23 24:1<br>**we'll (3)**<br>25:20,21 26:6<br>**we're (10)**<br>12:23 13:13 19:14<br>23:9,14 24:3 25:17<br>28:8 29:4 30:7<br>**we've (2)**<br>9:13 17:24<br>**White (2)**<br>14:6,9<br>**willing (2)**<br>12:9 28:14<br>**wise (1)**<br>20:23<br>**wish (3)**<br>27:25 28:1,2<br>**withdraw (1)**<br>3:17<br>**word (4)**<br>2:21 3:8,19 18:6 | **worked (2)**<br>9:23 31:8<br>**workforce (1)**<br>16:17<br>**works (1)**<br>26:6<br>**worth (1)**<br>4:19<br>**wouldn't (1)**<br>19:6<br>**written (4)**<br>4:24 6:16,19 14:15<br>**wrong (2)**<br>3:1 26:20<br>**wrote (1)**<br>28:4<br><br>**Y**<br>**Yardi (5)**<br>7:16 8:3,17,22 9:8<br>**yeah (9)**<br>4:17 7:14 8:23 9:14<br>10:3 14:18 15:5<br>27:11,24<br>**year (4)**<br>11:19 20:1 22:15<br>24:11<br>**years (2)**<br>9:23 10:11<br>**yesterday (2)**<br>6:23 18:23<br>**York (2)**<br>9:16,22<br><br>**0**<br>**08 (1)**<br>23:13<br><br>**1**<br>**1 (1)**<br>2:19<br>**1st (7)**<br>19:5,22,25 21:2 22:11<br>23:13 24:15<br>**1:51 (1)**<br>20:16<br>**10 (2)**<br>22:20,25<br>**100,000 (5)**<br>10:12,22 11:2,6,9<br>**11 (1)** | 14:1<br>**16 (1)**<br>15:1<br>**17 (2)**<br>9:23 16:11<br>**18 (1)**<br>9:23<br><br>**2**<br>**2000 (2)**<br>19:4,22<br>**2007 (2)**<br>2:7 22:16<br>**2008 (2)**<br>21:2 22:11<br>**2026 (1)**<br>15:19<br>**2220 (1)**<br>2:14<br>**24 (1)**<br>18:21<br>**25 (1)**<br>10:21<br>**25th (1)**<br>2:9<br><br>**3**<br>**3 (1)**<br>1:13<br>**3rd (3)**<br>19:4,25 24:14<br>**3:34 (1)**<br>2:7<br>**30th (1)**<br>2:7<br>**31st (1)**<br>22:16<br><br>**4**<br>**4 (1)**<br>26:5<br><br>**5**<br>**500 (1)**<br>10:21<br><br>**6**<br>**6 (1)**<br>18:22<br>**60,000 (1)**<br>10:14 |

| 7 |
|---|
| **7 (2)** |
| 11:19 18:22 |
| **77 (2)** |
| 3:1 20:8 |
| **77th (2)** |
| 2:6 11:5 |

| 8 |
|---|
| **82nd-83rd (1)** |
| 27:21 |

| 9 |
|---|
| **90 (3)** |
| 5:5,9 6:6 |

# EXHIBIT 2



REAL ESTATE MANAGEMENT AGREEMENT

FOR

HALSTEAD HARRISON AVENUE VENTURE

JANUARY 1, 2002

# TABLE OF CONTENTS

ARTICLE 1     APPOINTMENT AND AUTHORITY OF THE AGENT; DEFINED TERMS     3

ARTICLE 2     THE AGENT'S AGREEMENTS     4

ARTICLE 3     INSURANCE; INDEMNIFICATION     11

ARTICLE 4     MANAGEMENT FEES     12

ARTICLE 5     TERM/TERMINATION     14

ARTICLE 6     ARBITRATION     17

ARTICLE 7     MISCELLANEOUS     18

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of January, 2002, between **HALSTEAD HARRISON AVENUE VENTURE** (the "Owner"), having offices in care of Minskoff Grant Realty & Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 270-278 Halstead Avenue, Harrison, NY, 10528, County of Westchester, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.

## APPOINTMENT AND AUTHORITY
## OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

## ARTICLE 2.

## THE AGENT'S AGREEMENTS

2.1.    Provided the Owner makes available the funds required therefore, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.  To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property. All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible. Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent. All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner. Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.  At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

2.1.3. To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours. The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision. Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

2.1.4. To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge. The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

2.1.5. To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

2.1.6. To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7. Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in Exhibit A (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8. At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention. The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9. To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10. To notify the Owner promptly (together with copies of supporting documentation) of: any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

2.1.11.    To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.    To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company agreement, mortgage and other similar agreements.  The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions.  All checks over $10,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1, hereof, except for checks in payment of budgeted and/or approved expenditures.

2.1.13.    To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.    Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1. hereof, and sole right in its discretion to approve or disapprove proposed tenants or lease transactions.  No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

interest of the partners/members of the Owner.

2.2.    The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt and processing of all of the monthly bank statements, in form reasonably satisfactory to the Owner. The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property. No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases. The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner. Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.    The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.    a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.    a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.    a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.    a monthly tenant arrears statement aging the balances as required;

2.3.5.    Quarterly rent roll and budget comparisons; and

         2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

         2.4. The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

         2.5. Commencing with respect to the calendar year 2003, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property. Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense. With respect to calendar year 2002, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate. Until the Owner approves a new budget, the Agent shall operate the Property under the proposed budget, including non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

         2.6. Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1(a)(iii) hereof.

         2.7. The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise. In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property. Owner's members/partners may participate personally or by conference call.

## ARTICLE 3.

## INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith. The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith. The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives. Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion. To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

3.2.1.  The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.   In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses.  Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing.  Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.   The provisions of this Article 3 shall survive the termination of this Agreement.

## ARTICLE 4.

### MANAGEMENT FEES

4.1.   For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.50% of the total income per year.  The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1.  On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefore (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

4.1.2. In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in <u>Exhibit B</u> in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 50% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 75% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

### ARTICLE 5.
### TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from January 1, 2002 through December 31, 2006. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of December 31, 2006 and thereafter as to each annual extension, as of October 1 of each year.

5.1.1. Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2. Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3. Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

other penalty. The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.2.    Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2., the following to the Owner or the Owner's appointed agent:

5.2.1.  upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

5.2.2.  Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

5.2.3.  a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

5.2.4.  All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

5.2.5.  a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder.

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.    assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.    remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.    otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.
## ARBITRATION

6.1.    <u>Arbitration</u>.

6.1.1.    For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association.  The arbitration panel shall consist of one arbiter.  Within twenty (20) days after the above notice is given, the parties shall mutually agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in

commercial real estate. If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

6.1.2. The parties shall file with the arbiter, and exchange among counsel within ten (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree). No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

6.1.3. The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment. The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding. Judgment upon the arbitration award may be entered in any court having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less. The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.

## MISCELLANEOUS

7.1. Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of

the partners/members of the Owner.

7.2    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on <u>Exhibit A</u> attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested. Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner. For the purposes of this provision, "immediate family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.    No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.    All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.    The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.    No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.    The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof.  No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof.  The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.    This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.   This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.   The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.


**HALSTEAD HARRISON AVENUE VENTURE**

BY: _Marjorie Minskoff Schleifer_
　　　　Marjorie Minskoff Schleifer
　　　　Partner MLPIII

BY: _Jean M Grant_
　　　　Jean Minskoff Grant

BY: _____
　　　　Carolyn Minskoff
　　　　Estate of Myron A. Minskoff


**MINSKOFF GRANT REALTY & MANAGEMENT CORP., AS AGENT**

BY: _Jean M Grant_
　　　　Jean Minskoff Grant, President

## EXHIBIT A

1. Owner's Address:

Halstead Harrison Avenue Venture
c/o Minskoff Grant Realty and Management Corp.
1350 Avenue of the Americas
32nd Floor
New York, NY 10019

with copies to:

Marjorie Minskoff Schleifer
Partner MLPIII
c/o Minskoff Grant Realty & Management Corp.
1350 Avenue of the Americas/32nd Floor
New York, NY 10019

and

Jean Minskoff Grant
c/o Minskoff Grant Realty & Management Corp.
1350 Avenue of the Americas/32nd Floor
New York, NY 10019

and

Carolyn Minskoff
Estate of Myron A. Minskoff
1350 Avenue of the Americas/23rd Floor
New York, NY 10019

2. Agent's Address:

Minskoff Grant Realty & Management Corp.
1350 Avenue of the Americas
32nd Floor
New York, New York  10019

Attention:  Jean Minskoff Grant

L:\MGRMC\HALSTEAD\ManagementAgreement1402.doc                    21

3. Name of Bank Account:

      Account No. 811550701


4. Name of Bank:           Sterling National Bank


5. Independent Auditors:      Altman & Dick
                                  350 Broadway
                                  New York, NY 10013


All designations in this Exhibit A may be changed at any time by the Owner.

## EXHIBIT B

Leasing Commissions Schedule as per current published rates in the marketplace, to be updated accordingly.

First year or any fraction thereof ...........................6%

Second & Third year……………………….......6%

Fourth year up to and including the tenth year ........3%

The eleventh year and beyond ...........…………...2%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

      (a) charges, if any, for electric and steam to be supplied to Tenant;

      (b) any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

      (c) any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

      (d) any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

      (e) rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist. Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term. If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid. If the lease is not so canceled by the tenant or the right of cancellation

is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term. A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

| Westchester | | Current |
|---|---|---|
| | 1 | 6% |
| | 2 | 6% |
| | 3 | 6% |
| | 4 | 3.00% |
| | 5 | 3.00% |
| | 6 | 3.00% |
| | 7 | 3.00% |
| | 8 | 3.00% |
| | 9 | 3.00% |
| | 10 | 3.00% |
| | 11+ | 2.00% |

**Management Fee/Renewal Brokerage Adjustments:**

MANAGEMENT FEES:

In order to be able to continue to provide the high level of service and professional management we requested a modest fee increase from properties which were currently paying 3.5%.

One of our major owners suggested that we alter our fee scale such that the properties are treated with parity across the board, relative to their earnings.

The schedule is as follows

> **Properties with up to $250,000 of Budgeted Gross income Pay 5%.**
>
> **Properties with between $250,000 and $499,000 of Budgeted Gross income Pay 4.5%.**
>
> **Properties with $500,000 or more Budgeted Gross Income pay 4%.**

All budgets will reflect this change, as of January 1, 2006, if there are any problems with this change please contact me to discuss these issues?

We currently manage a total of 17 properties, five (5) are not subject to the approval of non-Marjorie Minskoff Schleifer Family members. A majority of owners for the following nine (9) properties have already approved this structure:

> **WYKAGYL (09)**
> **82nd 83rd STREET VENTURE (11)**
> **HALSTEAD & HARRISON (12)**
> **77TH QUEENS ASSOCIATES (13)**
> **UNION & UTOPIA (16)**
> **193 EAST POST ROAD (17)**
> **29 COURT STREET (19)**
> **BRYPOST (20b)**
> **NINTH STREET ASSOCIATES (32)**

RENEWAL FEES:

We have approval from fourteen (14) of the properties that brokerage fees on renewals will be paid in a lump sum. We would appreciate the ability to do that with all the properties in order to be consistent.

L:\ACCTNG\Budgeting\Management Fee Adjustments 12.15.05.doc

**ORIGINAL**

**REAL ESTATE MANAGEMENT AGREEMENT**

**FOR**

**77TH QUEENS ASSOCIATES**

**April 1, 2000**

## TABLE OF CONTENTS

ARTICLE 1   APPOINTMENT AND AUTHORITY OF THE AGENT; DEFINED TERMS     3

ARTICLE 2   THE AGENT'S AGREEMENTS     4

ARTICLE 3   INSURANCE; INDEMNIFICATION     11

ARTICLE 4   MANAGEMENT FEES     12

ARTICLE 5   TERM/TERMINATION     14

ARTICLE 6   ARBITRATION     17

ARTICLE 7   MISCELLANEOUS     19

# REAL ESTATE MANAGEMENT AGREEMENT

**THIS AGREEMENT**, made as of the 1st day of April, 2000, between 77th Queens Associates (the "Owner"), having offices in care of Minskoff Grant Realty and Management Corp., 1350 Avenue of the Americas, 32nd Floor, New York, New York 10019, and **MINSKOFF GRANT REALTY & MANAGEMENT CORP.** (the "Agent"), a New York corporation having an office at 1350 Avenue of the Americas, 32nd Floor, New York, NY 10019.

## WITNESSETH:

**WHEREAS**, the Owner is the owner of certain real property located at 116-02/32 Queens Blvd., Forest Hills, NY 11375, County of Queens, State of New York (the "Property"); and

**WHEREAS**, the Owner and the Agent desire to enter into this Real Estate Management Agreement (this "Agreement");

**NOW, THEREFORE**, the parties hereto agree as follows:

## ARTICLE 1.
## APPOINTMENT AND AUTHORITY
### OF THE AGENT; DEFINED TERMS

1.1.    The Owner hereby appoints the Agent as the managing agent and the exclusive leasing agent for the Property, and hereby authorizes the Agent to exercise such powers with respect to the Property as may be necessary for the performance of the Agent's obligations under Article 2, and the Agent accepts such appointment on the terms and conditions hereinafter set forth.

## ARTICLE 2.

### THE AGENT'S AGREEMENTS

2.1.   Provided the Owner makes available the funds required therefor, including the payment of Agent's compensation, the Agent agrees to manage, lease, operate and maintain the Property, at the Owner's expense, in compliance with the Owner's instructions, and in connection therewith:

2.1.1.   To contract, for periods limited to the Owner's ownership of the Property but not in excess of one year, in the name and at the expense of the Owner, for gas, electricity, water and such other services as are being currently furnished to the Property. All service contracts shall be negotiated and reviewed by the Agent and shall be written to include a thirty (30) day notice of cancellation by the Owner whenever possible. Agent shall notify the Owner and obtain its consent before entering into any contract with any person related to or affiliated with the Agent or any principals of the Agent. All contracts or purchase orders in excess of $10,000 entered into by the Agent on behalf of the Owner, whether for capital or operating expenses, shall be bid with at least two contractors whenever practicable (but no more frequently than every two years with respect to contracts for continuing work) and approved by the Owner. Competitive bidding shall not be required (i) for work requiring an expenditure of less than $10,000, (ii) work to be performed by engineers, architects, space planners, consultants and similar professionals, or (iii) work necessitated by the occurrence of an emergency or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty, if, under the relevant circumstances, the time required for competitive bidding would make competitive bidding impractical;

2.1.2.   At the expense of the Owner, and subject to the Owner's approval of any employees not reflected in the budget, to select, employ, pay, supervise, monitor the performance of and direct all employees necessary for the operation, maintenance and repair of

the Property, discharge any such employees, carry workers compensation insurance, as applicable (and, when required by law, compulsory non-occupational disability insurance) covering such employees, and to use reasonable care in the selection of such employees. The cost of any employee providing services to more than one property shall be allocated among such properties based on the proportion of time spent servicing each property. The Agent will be and will continue throughout the term of this Agreement to be an equal opportunity employer. All persons employed in connection with the operation and maintenance of the Property shall be employees of the Agent or of its independent contractors, unless the Owner shall otherwise consent. Upon the expiration or earlier termination of this Agreement, the Agent agrees unconditionally to the Owner's or successor managing agent's employment of all personnel employed by the Agent in connection with the operation or maintenance of the Property, should the Owner or successor managing agent elect in its sole discretion. On-site staffing shall not be hired for the Property without the prior approval of the Owner;

2.1.3. To keep the Property in a clean and sightly condition, to procure contractors or subcontractors for making all repairs, alterations, replacements and installations at the Property, decorate, purchase all supplies and perform all other acts necessary for the proper operation of the Property, the fulfillment of the Owner's obligations under any lease, building loan or mortgage agreement (relating to the operation, maintenance or leasing of the Property) and the compliance with all governmental and insurance requirements relating to the Property. The Agent shall prepare a plan, where necessary, with respect to the management, maintenance and operation of the Property and shall advise the Owner with respect to alternatives for renovating, rehabilitating, maintaining, altering, repairing and operating the Property; included in such plan shall be a comprehensive review of the Property's mechanical systems. The Owner shall receive the benefit of all discounts and rebates obtainable by the Agent in its operation of the Property. With the Owner's prior written consent, the Agent or general contractor working under the supervision of the Agent is authorized to make repairs and alterations and perform

other services to the Property at a tenant's request and at the tenant's sole expense (such work is hereinafter referred to as "Tenant Work"), and the Agent may collect from such tenant or such general contractor, for its sole account, commercially reasonable charges for performance of the work, for supervisory overhead on all such Tenant Work, and for other reasonable and customary charges, except that the Agent shall pay the Owner reasonable compensation for its use of any building personnel in performing any such Tenant Work during normal business hours. The Agent, when acting for its own account as independent contractor and not acting on behalf of the Owner, shall hold the Owner harmless from any and all claims which may be advanced by any such tenant in connection with Tenant Work performed by the Agent or under the Agent's supervision. Notwithstanding the foregoing, the Agent shall not be required to indemnify the Owner in connection with repairs and alterations undertaken on the Owner's behalf, at the Owner's direction, or in connection with the Agent's oversight of routine repairs and alterations performed by third party contractors on behalf of the Owner and in such events, the indemnity provisions in Section 3.2(a) shall control.

2.1.4. To handle complaints and requests from tenants, to notify the Owner of any major complaint made by a tenant of which the Agent has actual knowledge, and to notify the Owner promptly (together with copies of supporting documentation) of any material defect in the Property or any other material condition or occurrence concerning the Property of which the Agent has actual knowledge. The Agent shall also refer inquiries by members/partners in the Owner as directed by the Owner;

2.1.5. To notify the Owner's general liability insurance carrier and the Owner promptly of any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property of which the Agent has actual knowledge, and promptly to forward to the carrier, with copies of all such documents to the Owner, any summons, subpoena or other similar legal document served upon the Agent relating to actual or alleged potential liability of the Owner, the Agent or the Property;

2.1.6. To forward to the Owner, upon request, any certificates of insurance and renewals thereof, required to be furnished by tenants or contractors;

2.1.7. Unless the Owner elects otherwise, to calculate rental payments due from tenants, including but not limited to escalation payments, to render bills for the same on a timely basis and to receive and collect rent and all other monies payable to the Owner by all tenants, licensees and other persons using or occupying the Property and to deposit the same promptly in the bank named in Exhibit A (the "Bank") in an account of the Owner (the "Bank Account"), which account shall be used exclusively for such funds;

2.1.8. At the expense, and with the prior approval, of the Owner, to institute legal actions or proceedings for the collection of rent or other income for the Property, or the ousting or dispossessing of tenants or other persons therefrom, and all other matters requiring legal attention. The Owner reserves the right to designate counsel and to control litigation of any character affecting or arising out of the operation of the Property;

2.1.9. To bond by a fidelity bond, at the Agent's expense and with coverage terms and amounts reasonably acceptable to Owner, the Agent and all of the Agent's employees who may handle or be responsible for monies or property of the Owner;

2.1.10.     To notify the Owner promptly (together with copies of supporting documentation) of: any notice of violation of any governmental requirements, including, but in no way limited to, violations existing relative to the leasing, use, repair and maintenance of the Property, under federal, state and municipal laws and ordinances, of which the Agent has actual knowledge; any lawsuits or threats thereof involving the Property of which the Agent has actual knowledge; any fire or other damage to the Property of which the Agent has actual knowledge and in connection therewith, to immediately telephone notice to the Owner's general insurance office (to be promptly followed up with written notice), in an effort to enable an insurance adjuster to view the damage before repairs are started and complete customary loss reports in connection with fire or other damage to the Property;

2.1.11.    To review all real estate tax assessments, and assist the Owner in trying to reduce real estate taxes;

2.1.12.    To prepare checks and make other arrangements to pay, on behalf of the Owner, all taxes, including sales tax, special assessments, ground rents, insurance premiums and mortgage payments and other payments required to be made by the Owner pursuant to agreements by which the Owner is bound or to which the Owner is a party (of which the Agent is aware), including but not limited to the Owner's joint venture/partnership/limited liability company  agreement, mortgage and other similar agreements.  The Agent shall also prepare checks for cash distributions to partners in accordance with the Owner's instructions.  All checks over $5,000 shall be signed by two members/partners of the Owner in accordance with Section 7.1, hereof, except for checks in payment of budgeted expenditures.

2.1.13.    To undertake work required to address emergencies or to comply with legal requirements or to avoid civil or criminal liability or the imposition of a fine or other penalty.

2.1.14.    Subject to the continuing control and approval of the Owner, to advertise the Property for lease, to prepare and secure signs, plans, circular matter and/or other forms of advertising, to investigate and develop offers and inquiries received by Agent or the Owner with respect to the leasing of any space in the Property and to solicit as exclusive broker the cooperation of other licensed real estate brokers to endeavor at all times to lease all space at the Property, provided, however, that Agent shall have no authority, and shall not hold itself out as having authority, to sign or bind the Owner to any lease or other agreements relating to the occupancy of space or any renewals, amendments or extensions thereof (collectively, "Lease Agreements"), the Owner expressly reserving all right and authority to execute or cause to be executed all Lease Agreements on its own behalf (through any two of its members/partners in accordance with Section 7.1, hereof) and sole right in its discretion to approve or disapprove proposed tenants or lease transactions.  No Lease Agreement shall be treated as authorized unless it shall have been expressly approved in writing by a majority-in-

interest of the partners/members of the Owner and executed by two (2) partners/members of the Owner in accordance with Section 7.1. hereof.

2.2.    The Agent agrees to render monthly reports relating to the management and operation of the Property for the preceding calendar month, on or before the fifteenth (15th) day of each month, or as soon after the receipt all of the monthly bank statements, in form reasonably satisfactory to the Owner.  The Agent agrees that the Owner shall have the right to require the transfer to the Owner at any time of any funds in the Bank Account considered by the Owner to be in excess of the amount reasonably required by the Agent for disbursement purposes in connection with the Property.  No funds held or collected by the Agent in connection with the Property shall be commingled with any other funds of the Agent, including security deposits by tenants under leases.  The Agent agrees to keep proper records with respect to the management and operation of the Property, including a general ledger, and to retain those records for periods specified by the Owner.  Each partner/member of the Owner shall have the right to inspect and copy such records upon five (5) business days' written notice and audit the reports required by this Agreement for a period of two (2) years following the applicable year.

2.3.    The Agent agrees to render within (i) fifteen (15) days after the end of a particular month, (ii) thirty (30) days after the end of a particular quarter, and (iii) one hundred and twenty (120) days after the end of a particular year, the following reports:

2.3.1.   a statement of rents and other receipts collected for the preceding relevant calendar period (month, quarter or year) to date;

2.3.2.   a statement of disbursements for the preceding relevant calendar period (month, quarter or year) to date, together with reconciliation of such disbursements with the Owner's bank statements;

2.3.3.   a summary cash flow statement for the preceding relevant calendar period (month, quarter or year) to date showing beginning and ending cash balances;

2.3.4.   a monthly tenant arrears statement aging the balances as required;

2.3.5.   Quarterly rent roll and budget comparisons; and

2.3.6. a monthly building operating Status report summarizing major events affecting the Property.

2.4.    The Agent shall ensure that such controls are maintained over accounting and financial transactions relating to the Property or the Agent's activities under this Agreement as are reasonably required to protect the Owner's assets from loss or diminution.

2.5.    Commencing with respect to the calendar year 2001, the Agent shall prepare and submit to the Owner by October 31 of the previous calendar year a preliminary annual operating and capital budget for the promotion, operation, repair and maintenance of the Property.    Such budgets shall be prepared on an accrual basis, showing a month-by-month projection of income and expense.  With respect to calendar year 2000, the Agent shall prepare a budget as soon as is practicable. Such budgets shall be subject to the Owner's approval and shall be revised during the year, if appropriate.  Until the Owner approves a new budget, the Agent shall operate the Property under the existing budget, except for non-discretionary items, such as real estate taxes and utilities, which shall be deemed approved by Owner.

2.6.    Notwithstanding anything contained in this Agreement to the contrary, the Agent shall not, without the prior written approval of the Owner, make any expenditure or incur any obligation by or on behalf of the Owner involving a sum in excess of $10,000 for any transaction, except for (i) normal expenses incurred in the ordinary course under an Owner-approved operating or capital budget, (ii) obligations incurred pursuant to an Owner-approved contract or (iii) expenditures required to remedy a condition of an emergency nature as described in paragraph 2.1.1.(iii) hereof.

2.7.    The Agent shall cooperate with the Owner's accountants, attorneys and other advisors in connection with annual reviews, audits or otherwise.  In addition, the Agent shall attend periodic meetings with the Owner and its partners as may be reasonably required to advise the Owner of the status of operations in the Property.  Owner's members/partners may participate personally or by conference call.

## ARTICLE 3.

## INSURANCE; INDEMNIFICATION

3.1.    The Owner shall carry casualty and liability insurance upon the Property and shall look solely to such insurance with respect to any loss or damage to the Property, except as provided herein. The Owner shall either obtain waivers by the insurer of rights of subrogation against the Agent under such policies or shall have such policies name the Agent as an additional insured.

3.2.    (a) The Owner shall indemnify and hold harmless the Agent, its affiliates and their respective officers, directors, shareholders, partners and employees from and against all claims, losses and liabilities occasioned by or in connection with or arising out of acts or omissions of the Agent arising in connection with this Agreement, except in cases of negligence, willful misconduct or bad faith. The foregoing indemnity and hold harmless provision shall include, but not be limited to, claims, losses, liabilities, costs and expenses arising directly or indirectly out of the Owner's failure to provide funds to enable the Agent to address any emergency, failure to comply with laws or legal requirements or work necessitated in connection therewith. The Owner shall also indemnify, defend and hold Agent and its shareholders, partners, directors, officers, employees and representatives harmless against any damage, loss or expense it actually suffers or incurs, including reasonable attorneys' fees, arising from (i) distributions made by Agent in accordance with instructions by the Owner or its representatives and (ii) the failure to make distributions if not authorized to do so by Owner or its representatives. Notice of the assertion of any such claim shall be promptly given to the Owner after the Agent obtains knowledge of such assertion. To the extent that Owner is the employer of persons involved with the operation and maintenance of the Property, Owner shall be responsible for, and shall indemnify Agent from and against claims made against Agent for, any sales or similar taxes that may be due with respect to such employees.

3.2.1.  The Agent agrees to indemnify and hold the Owner and each partner, member, officer, employee, agent or other representative of the Owner harmless against any claims, losses and liabilities to the extent that they result from the Agent's negligence, willful misconduct or bad faith in connection with the Agent's performance of its duties under this Agreement.

3.3.    In the event a claim against the Agent arising out of or related to the Agent's conduct with respect to the Property to which the Agent is entitled to indemnification under Article 3 is brought by any third party against the Agent, the Owner shall pay the Agent's reasonable legal fees and expenses.  Alternatively, the Owner may assume the defense of any claim against the Agent through counsel of Owner's choosing.  Upon the rendering of a final, non-appealable judgment by a court or other authorized party that the damages, loss, costs or expense resulting from the claim was caused by Agent's negligence, willful misconduct or bad faith, then Agent shall reimburse the Owner for expenses so paid to the extent, but only to the extent, that the Court determines that the claim was attributable to such negligence, willful misconduct or bad faith.

3.4.    The provisions of this Article 3 shall survive the termination of this Agreement.

### ARTICLE 4.

### MANAGEMENT FEES

4.1.    For and in consideration of the services to be performed by the Agent pursuant to Article 2, the Owner agrees to pay the Agent a fee of 3.5% (of total income) per year for the first year of the term.  Thereafter, the fee for each year this Agreement remains in effect shall increase by five (5%) percent of the fee for the immediately preceding year.  The management fee shall be payable monthly prior to the last day of each such calendar month.

4.1.1.  On a monthly basis, the Owner shall reimburse the Agent for: the cost of the Agent's personnel (viz. any building manager, assistant building manager, building

employees) who devote full time to the Property and who have been employed pursuant to an Owner-approved budget or otherwise with the Owner's approval, including payroll, insurance, taxes, vacation, sick leave, severance, retirement, pension, benefits and related expenses (collectively "Payroll Costs") (but excluding the Payroll Costs of the Agent's leasing brokers); an allocable portion of the Payroll Costs of the Agent's employees devoting a portion of their time to the Property; all taxes, assessments, levies and fees payable by the Agent in connection with the performance of its duties under this Agreement (other than income, gross receipts, franchise and other similar taxes payable by the Agent); out-of-pocket costs and expenses paid by the Agent in connection with advertising, monthly brokerage listing sheets and promotional events; maintaining an office at the Property and purchasing supplies therefor (but excluding costs incurred by the Agent with respect to its home office); fees and expenses paid to consultants for services rendered to the Agent in connection with the services provided hereunder (and to the extent that the Agent's off-site personnel devotes time to the Property in lieu of a third party consultant, then the Agent shall be reimbursed for such time spent).

   4.1.2. In addition to fees payable to the Agent as provided above, the Agent shall be paid a full leasing commission as set forth in <u>Exhibit B</u> in connection with transactions consummated during the term of this Agreement for which the Agent is the effective procuring cause for a fully executed lease by a tenant approved by the Owner acting in its sole and absolute discretion, except that (i) the Agent shall be paid a commission equal to 75% of a full commission (computed on the basis that the original term of the lease included the renewal term) in connection with a tenant's renewal or extension of the term of a lease or the occupancy of replacement space, if pursuant to, or in satisfaction of, the exercise of a right or option in an existing agreement, (ii) the Agent shall be paid a commission equal to 50% of a full commission (computed as though the first year of the renewal period were the first year of the lease) in connection with lease renewals other than pursuant to, or in satisfaction of, an option contained in the lease, (iii) the Agent shall be paid a commission equal to 100% of a full commission in connection with a tenant's leasing additional space in the Property, whether pursuant to an option

or otherwise, (iv) the Agent shall be paid an override commission at one half the rate otherwise payable hereunder in the event a commission is payable to a third broker unaffiliated with the Agent in connection with a new lease, an expansion or an extension, and (v) no commission is payable in connection with any transaction for which a prior leasing agent for the Property is entitled to a commission. The Agent shall obtain written instructions or consent from the Owner for the payment of commissions to an unaffiliated third broker representing an existing tenant in the Property. The commission shall be earned, due and payable in three equal installments: one third upon the execution of the lease by the tenant and the Owner; one third upon the later of the commencement of the lease and actual occupancy of the leased premises by the tenant, and one third six (6) months after the tenant commences payment of rent, or at such other time(s) as Owner and Agent shall agree for any part of a commission if the tenant fails to take actual occupancy under the lease agreement. The Owner shall not be liable for any portion of the commission yet to be paid to the Agent if the tenant defaults in the payment of base rent for three (3) consecutive months and such default is not thereafter cured.

## ARTICLE 5.
## TERM/TERMINATION

5.1.    (a) This Agreement shall be in effect for the period from April 1, 2000 through March 31, 2005. If not otherwise earlier terminated as provided in this Agreement, this Agreement shall continue thereafter for additional periods of one year. The Owner and the Agent shall have the option, exercisable upon ninety (90) days' prior written notice, to terminate this Agreement for any reason effective as of March 31, 2005 and thereafter as to each annual extension, as of January 1 of each year.

5.1.1.    Notwithstanding anything herein to the contrary, this Agreement may be terminated by the Owner at any time during the term hereof upon five (5) business days' prior written notice "for cause" which shall include, but not be limited to the following: (i) if the

Agent shall fail to pay any sum of money due and payable by the Agent to the Owner or any third party (provided the Owner shall provide sufficient funds to the Agent therefore) within ten (10) days after notice from the Owner that any such sum is due and payable, or, in the case of a mortgage affecting the Property, if the Agent is required to make payments to the mortgagee (provided the Owner shall provide sufficient funds to the Agent therefore) and fails to make any required payments when due; or (ii) if the Agent shall fail to perform any of its other obligations under this Agreement within thirty (30) days after notice from the Owner, or within such longer period as may be reasonably required for such performance, provided that the Agent has commenced such cure within the above 30 day period and thereafter continuously and diligently prosecutes the same to completion.

The Agent shall not be in default under this Agreement if its performance of monetary (only if the Owner is obligated to provide funds but does not) or non-monetary obligations is prevented by circumstances beyond the Agent's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, inability to obtain labor or materials, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.1.2.  Either Agent or a majority interest in Owner shall have the option, exercisable upon written notice to the other party, to terminate this Agreement upon the sale of the Property to an unrelated third party, or a condemnation of all or substantially all of the Property.

5.1.3.  Upon thirty (30) business days' prior written notice, the Agent shall have the right to terminate this Agreement "for cause," which shall include but not be limited to (i) failure by the Owner to pay to the Agent amounts due hereunder within thirty (30) days of receipt of written notice thereof or (ii) failure by the Owner to provide funds or otherwise enable the Agent to (A) operate the property in a first class and professional manner and undertake work in connection with an emergency, which failure is not cured by the Owner within thirty (30) days of receipt of written notice, or (B) to avoid civil or criminal liability or imposition of a fine or

other penalty. The Owner shall not be in default under this Agreement if its performance of monetary or non-monetary obligations is prevented by circumstances beyond the Owner's reasonable control, including, without limitation, fire or other unavoidable casualty, national emergency, governmental restrictions, enemy action, civil commotion, strikes, lock-outs, other labor troubles, utility failures, riots, war, malicious mischief, acts of God and acts of third parties.

5.2.    Upon termination of this Agreement for any reason, the Agent shall deliver, as soon as reasonably possible, but no later than the deadlines set forth below in this Section 5.2, the following to the Owner or the Owner's appointed agent:

5.2.1.    upon termination and written directions concerning payment, all tenant security deposits held by the Agent with respect to the Property and ninety percent (90%) of any funds of the Owner held by Agent (provided that the Agent shall not be responsible for any delay by the depository institution or of any bank which issued a letter of credit);

5.2.2.    Any balance of monies of the Owner or tenant security deposits, or both, held by the Agent with respect to the Property within thirty (30) days after termination with an adjustment upon delivery of the final accounting;

5.2.3.    a final accounting, reflecting the balance of income and expenses for the Property as of the date of termination, within ninety (90) days after termination;

5.2.4.    All books and records, contracts, leases, insurance policies, tenant files, receipts for deposits, unpaid bills, a summary of all leases in existence at the time of termination, and all other papers or documents in Agent's possession that pertain to the Property upon termination; and

5.2.5.    a statement of all pending or completed negotiations and transactions as to which the Agent claims that a commission is or may be due, within thirty (30) days of termination.

If the Agent fails to turn over any of the foregoing materials or monies when required, the Agent shall pay to the Owner upon demand liquidated damages of $25,000, it being agreed that the Owner will incur damages the exact amount of which cannot be ascertained.

5.3.    Upon termination of this Agreement, by sale or otherwise, the Owner promptly shall pay to the Agent all amounts due hereunder, except that commissions payable to the Agent as real estate broker hereunder shall be paid by the Owner (or by its assignee or transferee in the event of a sale of the Property) when the same would otherwise be due hereunder.

5.4.    Upon any termination of this Agreement, the Agent shall:

5.4.1.  assign, transfer or convey to the Owner or its designee all service contracts and personal property relating to or used in the operation and maintenance of the Property, except any personal property which was paid for and is owned by the Agent;

5.4.2.  remove all signs that the Agent may have placed on the Property indicating that the Agent is the manager of the Property, and replace and restore any damage resulting therefrom; and

5.4.3.  otherwise cooperate with the Owner or its designee in the transition to new management, including, without limitation, by making itself available to consult with and advise the Owner or its designee with respect to the operation and maintenance of the Property.

## ARTICLE 6.

## ARBITRATION

6.1.    <u>Arbitration</u>.

6.1.1.  For disputes and claims between the parties that are not resolved within ten (10) days after any party gives notice to the other party of its desire to arbitrate the dispute or claim, the dispute shall be settled by binding arbitration in accordance with the then-prevailing rules of the American Arbitration Association.  The arbitration panel shall consist of one arbiter.  Within twenty (20) days after the above notice is given, the parties shall mutually

agree upon and appoint one arbiter, such person being a lawyer actively engaged in the practice of real estate law in New York City and having at least fifteen (15) years experience in the field, a judge, or a licensed New York real estate broker with at least fifteen (15) years experience in commercial real estate. If the parties do not agree upon and appoint an arbiter within said twenty (20) days, any party may apply to the AAA for appointment of the arbiter.

6.1.2.   The parties shall file with the arbiter, and exchange among counsel within ten (10) business days after the arbiter is appointed, opening briefs and proposed witness lists (including brief statements of the purpose for which each witness will be offered) and exhibits of all proposed documentary evidence (including brief statements of the purpose for which each document will be offered). At the same time, the parties shall provide the arbiter with a joint statement of any relevant facts upon which they are able to agree (or a joint statement that there are no relevant facts upon which they are able to agree). No witnesses or documents may be used at the hearing, except as disclosed in such lists, exhibits and statement, and then only to the extent not inconsistent with any applicable discovery responses.

6.1.3.   The arbiter shall resolve any dispute submitted to the arbiter within forty-five (45) days of appointment. The decisions of the arbiter shall be final and binding and may not be appealed to the courts of any jurisdiction except upon claim of fraud or corruption. Both parties shall continue performing their lease obligations pending the award in the arbitration proceeding.   Judgment upon the arbitration award may be entered in any court having jurisdiction. The arbiter shall award the prevailing party reasonable expenses and costs including reasonable attorneys' fees (to be conclusively determined by the arbiter) plus interest on any amount due at fifteen (15%) percent per annum or the maximum then allowed by applicable law, whichever is less. The losing party shall pay to the prevailing party the amount of the final arbitration award, and 100% of the costs and fees of the arbiter.

## ARTICLE 7.

## MISCELLANEOUS

7.1.    Wherever in this Agreement reference is made to "the Owner's consent", "the Owner's approval", "the agreement of the Owner" or phrases to similar effect, such references shall be deemed to refer to and require the written approval of a majority-in-interest of the partners/members of the Owner.  The requirements in <u>Sections 2.1.12. and 2.1.14.</u> of this Agreement that two (2) members/partners sign checks and leases shall be deemed to require signatures of (a) one Group A Partner and one Group B Partner, (b) one Group A Partner and one Group C Partner, or (c) one Group B Partner and one Group C Partner.  "Group A Partner" means Myron A. Minskoff, his successors and assigns; "Group B Partner" means Marjorie Minskoff Schleiffer, her successors and assigns, and "Group C Partner" means an executor of the Estate of Jerome Minskoff and the successors and assigns of the executors or, after settlement of the Estate, the beneficiary who succeeds to the Estate's interest in the Owner (or its legal representatives) or the successors or assigns thereof.

7.2.    All approvals, notices, requests and demands to be made hereunder shall be given in the manner provided below at the addresses set forth on <u>Exhibit A</u> attached hereto. Any statement, notice, recommendation, request, demand, consent or approval under this Agreement shall be in writing and shall be deemed given when delivered personally with receipt acknowledged by an officer for the Agent or the Owner, as the case may be, or twenty-four hours after being sent by hand or Federal Express (or other nationally recognized overnight delivery service), or seventy-two hours after being sent by registered or certified mail, postage prepaid, return receipt requested. Either party may, by notice, designate a different address.

7.3.    This Agreement shall not be assignable by either party and cannot be changed orally, but only by a writing signed by both parties, except that the Owner may transfer all of its rights and obligations hereunder to a limited liability company of which at least a majority in interest of its members are members or partners of the Owner or immediate family members of the members/partners of the Owner. For the purposes of this provision, "immediate

family members" shall mean the husband, wife, adult child, adult grandchild, father, mother, adult sister or adult brother of a member/partner, or a trust for the benefit of any of the foregoing individuals.

7.4.     No shareholder, officer or director of the Agent and no partner or member of the Owner shall have individual responsibility for the performance of any of the duties of the Agent or the Owner hereunder.

7.5.     All terms and words used in this Agreement, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender, as the context may require.

7.6.     The Article headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

7.7.     No remedy of either party is exclusive of any other remedy provided herein or at law, and all remedies available to either party shall be cumulative.

7.8.     The failure of either party to insist upon the strict performance of any obligation to be performed by the other party shall not be deemed to be a waiver thereof. No provision of this Agreement may be waived except by a writing signed by the party waiving any provision hereof. The waiver of any breach of this Agreement shall not be deemed a waiver of any subsequent breach of the same or any other obligation to be performed hereunder.

7.9.     This Agreement contains the entire Agreement of the parties with respect to the subject matter hereof, and all prior agreements or understandings, oral or written, are merged herein.

7.10.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

7.11.     This Agreement shall bind the parties hereto and their successors and assigns, and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

7.12.   The parties hereto hereby waive the right to trial by jury in any action or proceeding concerning the subject matter of this Agreement.

77TH QUEENS ASSOCIATES

BY:_____
        Myron A. Minskoff

BY:_____
        Marjorie Minskoff Schleifer

Estate of Jerome Minskoff

BY:_____
        Patricia Minskoff, Co-Executor

BY:_____
        United States Trust Company
        Of New York, as Co-Executor


MINSKOFF GRANT REALTY & MANAGEMENT CORP., AGENT

BY:_____
        Jean Minskoff Grant, President

<u>EXHIBIT A</u>

1. Owner's Address:

        77th Queens Associates
        c/o Minskoff Grant Realty and Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, NY 10019

        with copies to:

        Ms. Trish Minskoff                 Ms. Trish Minskoff
        435 Lower County Road           400 East 54th Street, #30H
        Harwichport, MA 02646           New York, NY 10022

        and

        Myron A. Minskoff
        Myron A. Minskoff Inc.
        1350 Avenue of the Americas/23rd Floor
        New York, NY 10019

        and

        Marjorie Minskoff Schleifer
        Minskoff Grant Realty & Management Corp.
        1350 Avenue of the Americas/32nd Floor
        New York, NY 10019

2. Agent's Address:

        Minskoff Grant Realty and Management Corp.
        1350 Avenue of the Americas
        32nd Floor
        New York, New York  10019

        Attention:  Jean Minskoff Grant

3.  Name of Bank Account:

        Account No. 251001681

4.  Name of Bank:          Chase

5.  Independent Auditors:

All designations in this <u>Exhibit A</u> may be changed at any time by the Owner.

## EXHIBIT B

Leasing Commissions Schedule

First year or any fraction thereof ............................5%

Second year ................................................4%

Third year up to and including fifth year .....................3%

Sixth year up to and including the 10th year...............2-1/2%

Eleventh year up to and including the 20th year................2%

Twenty-first year and beyond..................................1%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

(a)  charges, if any, for electric and steam to be supplied to Tenant;

(b)  any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

(c)  any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

(d)  any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

(e) rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum of $25 per square foot applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist.  Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the

lease for the uncancellable portion of the term. If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid. If the lease is not so canceled by the tenant or the right of cancellation is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term. A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

Management Agreement Amendment
January 1, 2006
EXHIBIT B
Queens Properties

Leasing Commissions Schedule as per current published rates in the marketplace, to be updated accordingly.

First year or any fraction thereof .............................5.00%

Second & Third year..........4.00%

Fourth year............3.50%

Fifth year...........3.00%

Sixth Year through the Tenth Year .............250%

Eleventh Year and beyond............200%

The Commission shall be based upon the actual rentals payable by tenants under leases, excluding the following:

(a)  charges, if any, for electric and steam to be supplied to Tenant;

(b)  any payments to be made by tenant on account of increases in real estate taxes, labor costs or expenses of maintaining and operating the Building, escalation provisions, overage rents or any other payments made by Tenant during the term of said lease that are considered to be "additional rent";

(c)  any payments to be made by Tenant on account of work, labor and materials to be furnished by Landlord;

(d)  any lease takeover payments made by Landlord or costs and expenses assumed by Landlord in connection with tenant's lease obligations for space previously rented by it in premises other than the Building;

(e)  rent concessions or other payments granted or paid to tenant, including work letters above the building standard maximum applicable to installation of new tenants, to be reviewed from time to time in light of existing market conditions.

Where the Owner has the sole right to cancel a lease at any time subsequent to the execution and delivery of the lease, Agent shall be paid a commission for the entire lease term as though such right to cancel did not exist.  Where a tenant, or the Owner and tenant, have the right to cancel a lease at a time subsequent to the commencement of the term but prior to the expiration date set forth in the lease, Agent shall initially be paid a commission based on the rental set forth in the lease for the uncancellable portion of the term.  If the lease shall be canceled by tenant pursuant to such option or other right, no commission shall be due or payable for the remainder of the term of such lease, unless the lease contains provisions obligating the tenant to pay or reimburse the Owner for the unamortized portion of the Agent's commission, in which event the entire commission shall be paid.  If the lease is not so canceled by the tenant or the right of cancellation is waived by the tenant, then, within thirty (30) days thereafter, Agent shall be paid the balance of the commission based on the rental for the remaining portion of the lease term.  A lease shall not be deemed canceled within the meaning of this paragraph unless the tenant vacates the Property.

| Queens | | Current |
| --- | --- | --- |
| | 1 | 5% |
| | 2 | 4% |
| | 3 | 4% |
| | 4 | 3.50% |
| | 5 | 3% |
| | 6 | 2.50% |
| | 7 | 2.50% |
| | 8 | 2.50% |
| | 9 | 2.50% |
| | 10 | 2.50% |
| | 11+ | 2.00% |

**Management Fee/Renewal Brokerage Adjustments:**

MANAGEMENT FEES:

In order to be able to continue to provide the high level of service and professional management we requested a modest fee increase from properties which were currently paying 3.5%.

One of our major owners suggested that we alter our fee scale such that the properties are treated with parity across the board, relative to their earnings.

The schedule is as follows

**Properties with up to $250,000 of Budgeted Gross income Pay 5%.**

**Properties with between $250,000 and $499,000 of Budgeted Gross income Pay 4.5%.**

**Properties with $500,000 or more Budgeted Gross Income pay 4%.**

All budgets will reflect this change, as of January 1, 2006, if there are any problems with this change please contact me to discuss these issues?

We currently manage a total of 17 properties, five (5) are not subject to the approval of non-Marjorie Minskoff Schleifer Family members. A majority of owners for the following nine (9) properties have already approved this structure:

> **WYKAGYL (09)**
> **82nd 83rd STREET VENTURE (11)**
> **HALSTEAD & HARRISON (12)**
> **77TH QUEENS ASSOCIATES (13)**
> **UNION & UTOPIA (16)**
> **193 EAST POST ROAD (17)**
> **29 COURT STREET (19)**
> **BRYPOST (20b)**
> **NINTH STREET ASSOCIATES (32)**

RENEWAL FEES:

We have approval from fourteen (14) of the properties that brokerage fees on renewals will be paid in a lump sum. We would appreciate the ability to do that with all the properties in order to be consistent.

L:\ACCTNG\Budgeting\Management Fee Adjustments 12.15.05.doc

# EXHIBIT 3

# MINSKOFF GRANT REALTY & MANAGEMENT CORP.

1350 AVENUE OF THE AMERICAS, NEW YORK NY 10019 • (212) 765-9700 FAX (212) 664-900?

May 24, 2004

Steven M. Pesner, Esq.
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
590 Madison Ave
New York, NY 10022

Re:     Letters of May 13, 2004

Dear Mr. Pesner:

I write in response to your letters dated May 13, 2004, requesting review of documents relating to various projects.

As I am sure the members of the Myron Minskoff family have reported, Minskoff Grant Realty and Management Corp. manages the eight (8) properties listed below.

1.  **WALDBAUMS – 63RD ROAD VENTURE**
2.  **9TH STREET ASSOCIATES**
3.  **59 SOUTH BROADWAY ASSOCIATES/POST-BROADWAY ASSOCIATES**
4.  **29 COURT STREET VENTURE**
5.  **82ND-83RD STREET VENTURE/COURT-MARTINE ASSOCIATES**
6.  **HALSTEAD-HARRISON ASSOCIATES**
7.  **77TH QUEENS ASSOCIATES**
8.  **8TH STREET ASSOCIATES**

As to the other properties referred to in your letters, please be advised as follows:

The property: **Madison – 74th Associates:**

This leasehold ended in 1997, there is very little assistance we can provide. This office never managed Madison - 74th. As a courtesy and for no remuneration, we held the remaining funds as legal counsel pursued a former tenant for arrears. The suit was successful and counsel distributed all funds remaining after legal expenses to the owners.

The property: **Queens Philadelphia:**  Was sold and closed on September 14, 2001.

In regard to the properties for which we have current management, the respective property owners receive the following:

**Monthly Report:**    **(Set of March 2004 Reports Included)**

> Cash Sheet indicating:
>> Cash Balance
>> Money Market Funds
>> Tenant Security Deposit
>> CD Value @ Purchase
>> Total Balance
>> Bank for property
> Building Status Reports
> Cash Accounts Balances and Activity
> Bank Account Balance Report
> Deposit Register
> Check Register
> Aged Receivables Summary

**Quarterly Report (additional information)**    **(Set of March 2004 Reports Included)**

> Quarterly Rent Roll
> Balance sheet
> Budget comparison Year-to-Date
> Quarterly Income Statement and Cash flow

**Annual Budget Preparation**

The budgeting process begins in the fall of the next budget year, and is a very interactive process with all owners able to comment and participate. Please note that the members of the Myron Minskoff Family have never disapproved a final budget.

**Lease/renewal/amendment negotiations**

All lease prospects are presented on a 3-4-page summary report for owner's approval.

**Unbudgeted Property Expenditure**

Owners receive information on any unbudgeted expenditures over $10,000 for approval.

It is my recollection that I have never once had a single comment or question posed on any point contained in any of these reports by Sara Allan, the MYCA LLP representative,

Mr. Allan, or Carolyn Minskoff. Mr. Allan comments on budgets and insurance but nothing else with respect to any of these the properties.

We are of course happy to cooperate in any way we can. We operate a tight ship and everyone here works more than a full time job. Therefore, in order to comply with a request of this magnitude, we have no choice but to set some ground rules.

Ground Rules:

1. Our office will set the times at our mutual convenience.
2. If the respective owner of a property under review is not present we will require written authorization for their representative.
3. If we believe in our reasonable judgment that any document(s) are confidential and/or proprietary we will require a confidentiality agreement.
4. Any time our employees spend on this will need to be reimbursed by your client.
5. Items to be copied will be marked and we will send them out for duplication at your client's expense.
6. We will require a security guard shall be present at all times. The cost of the guard will be at your client's expense.
7. You may review the documents that are here at this office which are current back through January 2003. Older documents are all in storage so we will then require you to specify a property. The storage boxes relating to that property will have to be ordered in advance of a scheduled visit. The cost of delivering the boxes here and returning them to storage will also need to borne by your clients.
8. We require that there be an advance of $20,000 to cover the anticipated costs as described above. Should 80% of this amount be expended your clients shall supplement this amount with an additional $20,000 payment.

Please confirm that these ground rules meet with your client's approval and contact me so that we can arrange the first meeting.

**Minskoff Grant Realty
& Management Corp.**

Jean Minskoff Grant
President

JMG:djs
Enclosure

3

CC:    Robb Aley Allan
    Sara Minskoff Allan
    Sally Edwards
    Stacey Minskoff Essenfeld
    Estate of Lucille Feldesman
    Michael Lockhard
    Alan & Royanne Minskoff
    Alan Minskoff Trust
    Alan Minskoff
    Carolyn Minskoff
    Edward Minskoff
    Estate of Jerome Minskoff
    John Eric Minskoff
    A.R.M. Minskoff Family LP

Maggie Minskoff QTIP Trust
Marjorie Minskoff Schleifer
Minskoff LP III
Stewart Minskoff
James Sterling
James K. Wolosoff
Morty&Gloria Wolosoff Foundation
Van Warren Wolosoff
Wendy Wolosoff

*All above without enclosures*

4